# NATIONAL RAILROAD PASSENGER CORPORATION v. ATCHISON, TOPEKA & SANTA FE RAILWAY CO. ET AL.

No. 83–1492.   Argued January 15, 1985—Decided March 18, 1985*

---

*Together with No. 83–1633, *Atchison, Topeka & Santa Fe Railway Co. et al.* v. *National Railroad Passenger Corporation,* also on appeal from the same court.

452

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the decision of the cases.

*Paul F. Mickey, Jr.*, argued the cause for appellant in No. 83–1492 and appellee in No. 83–1633. With him on the briefs were *William R. Perlik, David R. Johnson*, and *Andrea Timko Sallet.*

*Samuel A. Alito, Jr.*, argued the cause for the United States as appellee under this Court's Rule 10.4 in support of appellant in No. 83–1492 and appellee in No. 83–1633. With him on the brief were *Solicitor General Lee, Acting Assistant Attorney General Willard, Leonard Schaitman*, and *Al J. Daniel, Jr.*

*George A. Platz* argued the cause for appellees in No. 83–1492 and appellants in No. 83–1633. With him on the brief were *Howard J. Trienens, Thomas W. Merrill*, and *W. A. Brasher.*

JUSTICE MARSHALL delivered the opinion of the Court.

The question presented in these cases is whether Congress violates the Due Process Clause of the Fifth Amendment by requiring private railroads to reimburse the National Railroad Passenger Corporation (Amtrak) for rail travel privileges that Amtrak provides to the railroads' employees and former employees, and their dependents.

I

A

From the middle of the 19th century, the railroad passenger coach played a significant and sometimes romantic role in American cultural and economic life. By the middle of this century, however, "this time-honored vehicle" threatened to "take its place in the transportation museum along with the

stagecoach, the sidewheeler, and the steam locomotive."[1] Whereas in 1929 about 20,000 intercity trains operated in the country,[2] by 1946, there were only about 11,000 such passenger trains; by 1971, fewer than 500 passenger trains still operated.[3] As cars, buses, and airplanes displaced the passenger railroads, those railroads that continued to provide passenger carriage incurred heavy and continuing losses. At the same time, as common carriers these railroads were bound to continue providing service until the Interstate Commerce Commission (ICC) or state regulatory authorities relieved them of this responsibility. Given the tremendous operating losses, many of the remaining handful of railroads operating passenger coaches sought ICC permission to discontinue passenger train service.

The Rail Passenger Service Act of 1970 (Act or RPSA), 84 Stat. 1327, 45 U. S. C. § 501 *et seq.* (1970 ed.), which took effect on May 1, 1971, was Congress' effort to "revive the failing intercity passenger train industry and retain a high-quality rail passenger service for the Nation."[4] On concluding that a reorganized and restructured rail passenger system could be successful, Congress established the National Railroad Passenger Corporation, a private, for-profit corporation that has come to be known as Amtrak.[5] The corporation is not "an agency or establishment" of the Government but is authorized by the Government to operate or

---

[1] Hosmer, Examiner, Report and Recommended Order, Railroad Passenger Train Deficit, ICC Docket No. 31954, p. 69 (1958) (as quoted in G. Hilton, Amtrak: The National Railroad Passenger Corporation 9 (1980)).

[2] P. Dorin, Amtrak: Trains & Travel 14 (1979).

[3] H. R. Rep. No. 91–1580, pp. 2–3 (1970).

[4] GAO, Comptroller General, Nos. B–196907, CED–80–83, Report to the Congress, How Much Should Amtrak Be Reimbursed for Railroad Employees Using Passes to Ride Its Trains? (GAO Report), App. 48.

[5] H. R. Rep. No. 91–1580, at 5. Initially the corporation was to be named "Railpax." The corporation instead independently adopted the official nickname "Amtrak," which is a contraction of "American" and "Track." N. Y. Times, Apr. 20, 1971, p. 86, col. 7.

contract for the operation of intercity rail passenger service.[6] The Act outlined a procedure under which private railroads could obtain relief from their passenger-service obligations by transferring those responsibilities to Amtrak;[7] the Act authorized the new corporation to enter into standardized contracts with the private railroads, under which a railroad would be relieved "of all [its] responsibilities as a common carrier of passengers by rail in intercity rail passenger service under [Subtitle IV of Title 49] or any State or other law relating to the provision of intercity passenger service." 45 U. S. C. § 561(a)(1) (1970 ed.).[8]

To obtain relief from their common carrier obligations, the railroads had to agree to several conditions. First, "[i]n consideration of being relieved of this responsibility," a railroad was to pay Amtrak an amount equal to one-half of that railroad's financial losses from intercity passenger service during 1969. § 561(a)(2). Participating railroads also were to provide Amtrak with the use of tracks, other facilities, and services at rates to be agreed upon by the parties or, in the event of disagreement, to be set by the ICC. §§ 561, 562. The Act also included a labor protection provision requiring the railroads to "provide fair and equitable arrangements to

---

[6] H. R. Rep. No. 91–1580, at 5.

[7] Railroads that chose not to discontinue passenger service remained subject to the obligation to provide that service imposed on common carriers by the Interstate Commerce Act (ICA), 49 U. S. C. §§ 10908 and 10909. Section 404 of the RPSA, 45 U. S. C. § 564 (1970 ed.), declared a 5-year moratorium on the discontinuance of any intercity passenger train by any railroad that had not transferred its responsibilities to Amtrak, but authorized those railroads to seek discontinuances, through the procedures of the ICA, at the end of the 5-year period. See 49 U. S. C. § 13a (1970 ed.), recodified at 49 U. S. C. §§ 10908, 10909. In addition, all railroads remained subject to common carrier obligations to transport freight. 49 U. S. C. § 10903 *et seq.*

[8] The Act originally referred to the common carrier obligations under Part I of the ICA, see 84 Stat. 1328, 1334; that provision of the ICA was recodified in 1978 as Subtitle IV (§ 10101 *et seq.*) of Title 49, which is entitled "Interstate Commerce."

protect the interests of employees affected by discontinu-
ances of intercity rail passenger service." § 565(a). Partici-
pating railroads were required to enter into "protective
arrangements" with their unions, in which the railroads
promised to protect dislocated employees and to preserve
employee benefits, including pension rights and fringe bene-
fits. §§ 565(a)–(e).

Finally, in § 301 of the Act, 45 U. S. C. § 541 (1970 ed.),
Congress "expressly reserved" its right to "repeal, alter or
amend this Act at any time."

All but five private railroads offering intercity passenger
service took up the option provided by the Act and entered
into contracts, known as "Basic Agreements," with Amtrak.[9]
The participating railroads made the required payments to
Amtrak and shed their intercity rail passenger obligations.
On May 1, 1971, Amtrak began rail passenger service.

The Basic Agreements between the railroads and Amtrak
mirrored the provisions of the Act. For example, § 2.1
of each Basic Agreement, entitled "Relief from Responsi-
bility," relieved the signatory railroad "of its entire respon-
sibility for the provision of Intercity Rail Passenger Service."
App. 13. The Agreements also required the railroads to
make services, tracks, and facilities available and to protect
employees who would be affected by a discontinuance of
passenger service.

Section 7.5 of each Basic Agreement, entitled "Transporta-
tion Privileges," spelled out the rights of the railroads and
their employees to make use of Amtrak trains. The fifth
paragraph, which concerned the rights of railroad employees
to travel on Amtrak trains for free or at reduced fares, pro-
vided that "[t]ransportation privileges, if any, with respect to
business and personal travel of Railroad personnel shall be as

---

[9] The five nonparticipating railroads were Southern Railway Co., Den-
ver & Rio Grande Western Railroad, Chicago, Rock Island & Pacific Rail-
road, Georgia Railroad, and Canadian Pacific Railway Co.. GAO Report,
App. 48.

determined by [Amtrak]." The paragraph did not specify which party was to bear the cost of the transportation.

Shortly after Amtrak began operation, considerable controversy arose over Amtrak's decision to cut back employee pass privileges pursuant to the discretion accorded in this provision. The result of that controversy has given rise to this action, and we turn to consider the evolution of this dispute.

## B

Since the 1880's, railroad employees and retirees, and their dependents, have been able to ride passenger trains for free or at reduced rates. Before Amtrak assumed operation, the private railroads often permitted current and retired employees and their dependents to travel on the employees' home lines for free or at reduced rates, and many railroads had reciprocal agreements permitting employees and dependents of other railroads to travel at reduced rates as well.[10]

At the time Amtrak was created, between 1.4 million and 2 million rail-travel passes were outstanding.[11] Exercising its discretion under § 7.5 of the Basic Agreements, the corporation decided to confine pass privileges to employees of the railroads that operated trains for Amtrak, and to limit those privileges to half-rate fares. As a result, all railroad employees lost their pre-Amtrak access to completely free transportation, and employees of some railroads lost their pass privileges entirely. Amtrak then was faced with vehement protests from the railroads, which continued to operate both freight trains and some passenger service, and which asserted that the withdrawal of free transportation privileges for their employees threatened to produce severe labor problems for them.[12] The corporation thereafter restored some, but not all of the canceled privileges.

---

[10] See GAO Report, App. 47.
[11] Affidavit of Roger Lewis, App. 40.
[12] *Ibid.*

The railroads continued to protest vigorously the Amtrak decision to cut back pass-rider privileges. They also reaffirmed their concern about employee morale and the possibility of labor strikes if privileges were not restored. Congress responded to this problem in 1972 by amending the RPSA to restore free or reduced-rate transportation to all people who had enjoyed such privileges when Amtrak took over passenger rail service. Pub. L. 92–316, § 8, 86 Stat. 230–231. The new § 405(f) of the Act, 45 U. S. C. § 565(f) (1976 ed.) (1972 amendment), required Amtrak to assure, "to the maximum extent practicable," that all employees and dependents who had received free or reduced-rate transportation before Amtrak began operation would continue to be eligible for such benefits. In their Committee Reports, both the Senate and the House emphasized that railroad employees should not lose their longstanding pass privileges—privileges they had earned through years of service—simply on account of the transfer of service to Amtrak.[13] Amtrak implemented this amendment by permitting pass riders to travel free or at half fare depending on the length of an employee's railroad employment, whether the employee was retired, and whether he was traveling on or off the rail lines of his home railroad.[14] In addition, pass riders were eligible for travel on a space-available basis only; they were permitted to make reservations only 24 hours in advance on trains requiring reservations; and they were not permitted to use the passes on Amtrak's special trains called Metroliners.

The 1972 amendment also required the railroads to pay for "such costs as may be incurred" by Amtrak in providing the pass privileges mandated by § 405(f). As the Senate

---

[13] See S. Rep. No. 92–756, pp. 11–12 (1972) ("The Committee believes that employees who were entitled to free or reduced-rate transportation before the advent of Amtrak should not lose such privileges on account of the transfer of passenger service from the railroads to Amtrak"); see also H. R. Rep. No. 92–905, p. 11 (1972).

[14] See GAO Report, App. 53–54.

Committee explained: "Because Congress is merely continuing pass policies which the railroads themselves developed, it would appear that the railroads and not Amtrak should bear the cost, if any." S. Rep. No. 92–756, p. 11 (1972). The amendment did not specify how the costs were to be calculated but did provide that the ICC should resolve the issue if Amtrak and the railroads were unable to agree on the amount to be paid. The matter eventually was referred to the ICC, which set an interim reimbursement rate based on Amtrak's incremental operating costs of providing the service—that is, based on the additional cost to Amtrak to transport the riders. The initial rate was $.00079 per passenger mile. This amount was to be offset by the revenue derived from the reduced-rate fares paid by pass riders riding pursuant to the 1972 amendment.[15] The railroads also were to pay Amtrak for the administrative costs of the program. When the offset formula was applied, the revenue derived from the reduced-rate fares always exceeded the payments otherwise due from the railroads. As a result, the railroads reimbursed Amtrak solely for the pass program's administrative costs.[16] From 1972 to 1979, Amtrak collected from the railroads only administrative expenses amounting to about $500,000 per year.[17]

In 1979, however, Congress decided that the ICC's reimbursement rate resulted in inadequate compensation to Amtrak. Accordingly, in the Amtrak Reorganization Act of 1979, Pub. L. 96–73, §.120 (a), 93 Stat. 547 (Reorganization Act), Congress amended the § 405(f) pass-rider provision to require that the railroads prospectively reimburse Amtrak for pass-rider service at the rate of "25 percent of the systemwide average monthly yield per revenue passenger

---

[15] *Determination of Cost Reimbursement Under Section 405(f) of the Rail Passenger Service Act,* No. 27194, as amended, Dec. 21, 1972, App. 23–38 (unamended decision reported at 347 I. C. C. 325 (1972)).

[16] GAO Report, App. 51.

[17] 723 F. 2d 1298, 1300 (CA7 1983).

mile"—a rate that amounted to approximately one-fourth of the normal fare for ticket-buying passengers. The new rate was to remain in effect for two years.[18]

At the same time, Congress also directed the Comptroller General to conduct a study and, "taking into account the value of the services being provided," § 120(b), to make recommendations on the appropriate way to reimburse Amtrak for the cost of providing pass-rider transportation. In 1980, the General Accounting Office submitted a report to Congress that analyzed in detail two methods of reimbursement. GAO Report, App. 42–86. The report first considered reimbursing Amtrak for its incremental cost in providing the service, and second, for the value *to the pass rider* of the service being provided, which would be less than the fare charged a regular passenger, but which the report otherwise declined to quantify. Neither approach was necessarily the correct one, GAO decided: "Amtrak's costs to provide transportation to pass riders are debatable, and we did not find adequate analytical evidence to support one position over another or to recommend a specific means to reimburse Amtrak." *Id.*, at 43. The report therefore concluded that the choice between the two cost reimbursement formulas was "a policy decision that the Congress should make," *id.*, at 80; instead of offering an answer, the report simply outlined the available options. *Ibid.*

---

[18] After the amendment, Amtrak billed the railroads at rates from .02067 cents to .02343 cents per passenger mile. *Ibid.* In the first 10 months of operation under the 1979 amendment, the railroads represented to the Court of Appeals that they paid the following additional sums: Santa Fe, $336,249.82; Burlington Northern, $490,344.72; Chesapeake & Ohio and Baltimore & Ohio, $76,345.34; and Union Pacific, $287,784.66. *Id.*, at 1300, n. 2. Of course, as the years go by, the number of eligible pass riders declines because of employee and retiree deaths. Whereas amendment of the RPSA in 1972 gave free or reduced rate transportation to about 2.83 million people, in December 1979 only about 1.05 million eligible pass riders remained. GAO Report, App. 56.

After receiving the report, Congress again amended § 405(f) of the Act and provided that the 25-percent reimbursement requirement would remain in effect indefinitely. Pub. L. 97–35, 95 Stat. 697 (1981 amendment).

## C

The cases we consider began in 1980 when five railroads, each of which had taken advantage of the RPSA and discontinued passenger service, filed suit against Amtrak in the United States District Court for the Northern District of Illinois challenging the constitutionality of § 405(f) of the Act.[19] They argued that the requirement that they reimburse Amtrak for the pass travel of their employees, former employees, and dependents violated the Due Process Clause of the Fifth Amendment.

The railroads based this claim on four theories. First, they claimed they had a contractual right against the United States, derived from the RPSA and the Basic Agreements, to be free from the obligation to provide intercity rail passenger service. They asserted that § 405(f), which had been added to the Act in 1972, therefore impaired an obligation of the United States under this statutory contract because pass privileges constituted the "intercity rail passenger service," from which the railroads had been relieved of their "entire responsibility" in the RPSA. Thus, since Congress had contracted in the RPSA to relieve the railroads of intercity rail passenger service, and the railroads had fulfilled their obligations under the contract, they had a right to be free from the responsibility to provide pass privileges. Congress, they claimed, was impairing its contractual obligation through passage of § 405. Next, the railroads claimed that even if the Act itself were not a contractual obligation, the Basic

---

[19] The five railroads are Atchison, Topeka, and Santa Fe Railway Co., Burlington Northern, Inc., Chesapeake and Ohio Railway Co., Baltimore and Ohio Railroad Co., and Union Pacific Railroad Co.

Agreements, with identical "relief from responsibility" language, were such a contractual obligation of the United States; that obligation, the railroads asserted, was unconstitutionally impaired by the subsequent legislation. Third, they argued that, even if no contract existed between the United States and the railroads, the statutory requirement that the railroads pay Amtrak for allowing pass riders constituted a deprivation of property without due process. Finally, the railroads argued that, even if Congress might constitutionally require the railroads to reimburse Amtrak for the cost of the pass-rider program, the particular reimbursement formula set forth in the 1979 amendment exceeded the incremental cost to Amtrak of providing the service and therefore constituted a deprivation of property without due process. After the 1981 amendment was passed, the railroads amended their complaint to make their claims applicable to that amendment as well.

The railroads filed a motion for summary judgment, and Amtrak filed a cross-motion for summary judgment. The United States then intervened as a defendant under 28 U. S. C. § 2403 and filed a motion to dismiss or, in the alternative, for summary judgment. The District Court entered an order granting summary judgment in favor of Amtrak and the United States. 577 F. Supp. 1046 (1982). It concluded that the Act, as amended, did not constitute a contract between the United States and the railroads. It then assumed that the Basic Agreements were contracts between the United States and the railroads and held that § 405(f) did not impair that contract. The District Court found that the Agreements relieved the railroads of their *responsibility* to provide intercity rail service, but that by the railroads' own admission they never had a legal or contractual responsibility to provide free or reduced rate transportation to employees and their families. The court also observed that the Basic Agreements gave to Amtrak the discretion to determine what pass privileges, if any, the railroad employees should have.

The District Court rejected the railroads' argument that the requirement that they pay for their employees' pass-rider privileges violated due process and ruled that the railroads had not overcome the firmly established presumption of constitutionality that attaches to legislative Acts "'adjusting the burdens and benefits of economic life.'" *Id.*, at 1052 (quoting *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 15 (1976)). Because the legislation at issue was neither arbitrary nor irrational, the District Court concluded that the reimbursement requirement of § 405 did not violate due process under the *Turner Elkhorn* standard.

Finally, the court rejected the railroads' argument that Congress' reimbursement formula violated due process by requiring the railroads to pay more than the incremental cost to Amtrak of transporting the pass riders. "Having determined that the Congress acted constitutionally in requiring the railroads to reimburse Amtrak for the pass rider service, this court will not second-guess the legislative branch on its selection of a particular mathematical formula for reimbursement, absent a showing that the formula was selected in an arbitrary or irrational manner." 577 F. Supp., at 1055. The court then traced Congress' decisionmaking process to demonstrate that the choice of reimbursement plans was a rational policy decision, particularly in light of the conclusion in the GAO Report that the reimbursement issue involved a policy choice for Congress.

The Court of Appeals for the Seventh Circuit affirmed in part and reversed in part. 723 F. 2d 1298 (1983). The Court of Appeals rejected most of the railroads' arguments and held that the railroads could be compelled to reimburse Amtrak for the incremental cost of carrying the pass riders. The panel held, however, that the Basic Agreements provided the railroads with a contractual right to be free from having to "finance aspects of [Amtrak] operations that were once part of the railroads' entire responsibility for the provision of intercity rail passenger service." *Id.*, at 1302. According to the Court of Appeals, because the reimburse-

ment scheme in the 1979 amendment required the railroads to pay more than the incremental cost to Amtrak, these payments supported Amtrak's general intercity rail passenger service operations, and the statute therefore impaired the railroads' right to be free from the responsibility for providing intercity rail passenger service. The court ruled that this "windfall" to Amtrak violated the Due Process Clause, because it unreasonably and illegally impaired the rights of the railroads under the Basic Agreements.[20]

Amtrak appealed to this Court under 28 U. S. C. § 1252, arguing that the reimbursement formula in § 405(f) is constitutional, and we noted probable jurisdiction. 469 U. S. 813 (1984). The railroads cross-appealed, contending that any reimbursement violates due process. We deferred ruling on whether jurisdiction over the cross-appeal was proper until consideration of the cases on the merits. *Ibid.*[21]

---

[20] The court did not expressly state whether the statute impaired a private obligation between Amtrak and the railroads, or as the railroads maintained, a contract to which the United States was a party as well.

[21] We now find that jurisdiction over the cross-appeal is proper. The railroads filed their jurisdictional statement on cross-appeal within 30 days of their receipt of appellant's jurisdictional statement, as required by this Court's Rule 12.4. If the filing was properly a cross-appeal, then this procedure was jurisdictionally sound. We hold that the filing was properly a cross-appeal.

Title 28 U. S. C. § 1252 provides that "[a]ny party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States . . . holding an Act of Congress unconstitutional in any civil action . . . to which the United States or any of its agencies . . . is a party." In *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540, 543, n. 3 (1983), this Court ruled that the language of § 1252 was sufficiently broad to encompass the cross-appeal, which would not otherwise have been a proper appeal. This reading of § 1252 is buttressed by the fact that once we have properly asserted jurisdiction under § 1252, "the whole case is to come before us." *Heckler* v. *Edwards*, 465 U. S. 870, 879 (1984). Since the railroads correctly filed a cross-appeal in this case, the procedures for taking a cross-appeal under this

## II

The railroads argue that the RPSA and the Basic Agreements created a contractual obligation on the part of the United States not to reimpose any rail passenger service responsibilities on those railroads that entered into Basic Agreements, and that the pass-rider amendments to the Act unconstitutionally impair the "contract" into which the United States entered. Thus, the railroads conclude, the Court of Appeals correctly held that the 1979 and 1981 amendments substantially impaired their contractual rights and violated due process, but incorrectly ruled that the 1972 amendment, which required only that the railroads pay for the incremental cost to Amtrak of the pass riders, was constitutional. In making these arguments, the railroads argue first that the United States entered into a contractual relationship with the railroads, either through the RPSA or the Basic Agreements, and second that the scope of the contractual agreements encompassed reimbursement for pass-rider privileges. But, the railroads assert that, even if their contractual rights were only private ones with Amtrak, those private contractual agreements created a right to be free from paying for pass-rider privileges. They maintain that the 1979 and 1981 amendments, as well as the 1972 assessment of incremental costs, therefore unconstitutionally impaired those private contractual rights. We consider, and reject, each of these arguments in turn.

## A

The first question we address is whether the RPSA constituted not merely a regulatory policy but also a contractual arrangement between the United States and the railroads that entered into Basic Agreements. For many decades, this Court has maintained that absent some clear indication

---

Court's Rule 12.4 were properly invoked, the cross-appeal was timely, and we have jurisdiction over the cross-appeal.

that the legislature intends to bind itself contractually, the presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Dodge* v. *Board of Education*, 302 U. S. 74, 79 (1937). See also *Rector of Christ Church* v. *County of Philadelphia*, 24 How. 300, 302 (1861) ("Such an interpretation is not to be favored"). This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. *Indiana ex rel. Anderson* v. *Brand*, 303 U. S. 95, 104–105 (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, "'[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.'" *Keefe* v. *Clark*, 322 U. S. 393, 397 (1944) (quoting *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 548 (1837)). Thus, the party asserting the creation of a contract must overcome this well-founded presumption, *Dodge, supra,* at 79, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

In determining whether a particular statute gives rise to a contractual obligation, "it is of first importance to examine the language of the statute." *Dodge* v. *Board of Education, supra,* at 78. See also *Indiana ex rel Anderson* v. *Brand, supra,* at 104 ("Where the claim is that the State's policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract"). "If it provides for the execution of a written contract *on behalf of the state* the case for an obligation binding upon the state is clear." 302 U. S., at 78 (emphasis supplied). But absent "an adequate expression of

an actual intent" of the State to bind itself, *Wisconsin & Michigan R. Co.* v. *Powers*, 191 U. S. 379, 386–387 (1903), this Court simply will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the State is a party.

The language of the RPSA discloses absolutely no congressional intention to have the United States enter into a private contractual arrangement with the railroads. By its terms, the Act does not create or speak of a contract between the United States and the railroads, and it does not in any respect provide for the execution of a written contract *on behalf of the United States*. Quite to the contrary, the Act expressly established the National Railroad Passenger Corporation as a nongovernmental entity, 45 U. S. C. § 541, and it used the term "contract" not to define the relationship of the United States to the railroads, but instead that of the new, nongovernmental corporation to the railroads. The statute states clearly that "the Corporation is authorized to contract and, upon written request therefor from a railroad, shall tender a contract . . . ," 45 U. S. C. § 561(a), and that, "[u]pon its entering into a valid contract . . . , the railroad shall be relieved of all its responsibilities. . . ." *Ibid.* We simply cannot agree with the railroads that the frequent usage in a statute of the language of contract, including the term "contract," evidences an intent to bind the Federal Government contractually. Legislation outlining the terms on which private parties may execute contracts does not on its own constitute a statutory contract, but is instead an articulated policy that, like all policies, is subject to revision or repeal. Indeed, lest there be any doubt in these cases about Congress' will, Congress "expressly reserved" its rights to "repeal, alter, or amend" the Act at any time. 45 U. S. C. § 541. This is hardly the language of contract.[22]

---

[22] In the *Sinking Fund Cases*, 99 U. S. 700 (1879), this Court recognized the effect of these few simple words. In that case, railroads challenged Congress' amendment of statutes that governed their obligations to the

.Moreover, the circumstances of the Act's passage belie an intent to contract away governmental powers. Congress long had regulated the railroads and had compelled them through the ICC to continue unprofitable service and undertake new service. Indeed, the huge sums that the railroads insist they paid to Amtrak in "consideration" for the contractual right to be free from their passenger service obligations represented just one-half of the annual losses they suffered in one year under the prior regulatory scheme.

This atmosphere of pervasive prior regulation leads to several conclusions. For one, Congress would have struck a profoundly inequitable bargain if, in exchange for the equivalent of a half year's losses, it had entered into a binding contract never to impose on the railroads—which would continue to operate their potentially profitable freight services—any rail passenger service obligations at all.[23] Congress simply

---

Government on securities issued to aid the initial construction of the railways. The Court rejected the argument that the amendment improperly interfered with vested rights and observed that through the language of reservation "Congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments of the charter as come within the just scope of legislative power." *Id.*, at 720.

We also reject the railroads' argument that this clause reserved only the power to repeal, alter, or amend the National Railroad Passenger Corporation's corporate charter. The clause expressly reserved the right to change "this Act," and we see no ground to support the railroads' attempt to limit this term merely to a single aspect of the Act.

[23] The Act also required the railroads to enter into agreements with the new corporation to provide operational assistance and facilities at rates to be set by contract (or the ICC in the event of disagreement), 45 U. S. C. § 562 (1970 ed.), and to enter into arrangements to protect the interests of employees disadvantaged by the discontinuance of passenger service. § 565(a). These requirements either were consistent with the railroads' continuing obligations as common carriers, or easily might have been imposed as conditions by the ICC if it granted the railroads' petition to discontinue rail passenger service. See 49 U. S. C. §§ 10903(a)(2), 11101. Far from analogous to consideration, these ongoing regulatory obligations

cannot be presumed to have nonchalantly shed this vitally important governmental power with so little concern for what it would receive in exchange. Cf. *United States Trust Co.* v. *New Jersey*, 431 U. S. 1, 21–25 (1977) (considering reserved powers doctrine). Also, the pervasiveness of the prior regulation in this area suggests that absent some affirmative indication to the contrary, the railroads had no legitimate expectation that regulation would cease after 1971. Coupled with the statute's express reservation of the power to repeal, the heavy and longstanding regulation of this area strongly cuts against any argument that the statute created binding contractual rights. Cf. *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400, 413 (1983) (discussing implications of pervasive regulation for inquiry into substantial impairment of a contract).

The railroads argue nevertheless that the RPSA created a contractual obligation "closely analogous to the statutory covenant" at issue in *United States Trust*, "which this Court held to be a contractual obligation of a State subject to the Contract Clause." Brief for Appellees in No. 83–1492, p. 18. Far from recognizing the similarity, we find that the statute at issue in *United States Trust Co.* v. *New Jersey* highlights the difference between the RPSA and a true statutory contract. In *United States Trust*, the Court held that New Jersey could not retroactively alter a statutory bond covenant relied upon by bond purchasers. The covenant in that case was a part of the bistate legislation authorizing the Port Authority of New York and New Jersey to acquire, construct, and operate the Hudson & Manhattan Railroad and the World Trade Center in New York City. The statute read in part: "The 2 States covenant and agree with each other and with the holders of any affected bonds, as hereinafter defined, that so long as any of such bonds remain

---

further demonstrate that the RPSA was a legislative policy decision, not a private contractual arrangement.

outstanding and unpaid . . . neither the States nor the port authority nor any subsidiary corporation incorporated for any of the purposes of this act will apply any of the rentals, tolls, fares, fees, charges, revenues or reserves, which have been or shall be pledged in whole or in part as security for such bonds, for any railroad purposes whatsoever other than permitted purposes hereinafter set forth." 1962 N. J. Laws, ch. 8, § 6; 1962 N. Y. Laws, ch. 209, § 6. Resort need not be had to a dictionary or case law to recognize the language of contract. The States explicitly bound themselves in a covenant not to take certain actions now or in the future, and the intent to make a contract was, as a result, not even contested in that case. Indeed, the Court found that the States had drafted this language in an effort to invoke the constitutional protections of the Contract Clause as security against repeal.

To the contrary, here the statute does not contain a provision in which the United States "covenant[s] and agree[s]" with anyone to do anything, and in fact the United States expressly declined to offer assurances about future activity when it reserved the right to revoke or repeal the Act. We therefore are not persuaded by the railroads' proffered analogy.

Because neither the language of the statute nor the circumstances surrounding its passage manifest any intent on the part of Congress to bind itself contractually to the railroads, we hold that the RPSA does not constitute a binding obligation of Congress.

### B

We turn next to consider whether the Basic Agreements into which the railroads entered with Amtrak grant the railroads a contractual right *against the United States* to be free from all obligation to provide passenger service. While there can be no doubt that the Basic Agreements are contracts, they are contracts not between the railroads and the United States but simply between the railroads and the nongovernmental corporation, Amtrak. The United States was

not a party to the Basic Agreements; by their terms, the agreements do not implicate the United States. The railroads do not point to any language in the RPSA authorizing Amtrak to bargain away any portion of Congress' Commerce Clause power, or to act as the Government's agent and confer upon the railroads the right to be free of any obligation to provide passenger service, assuming even that Congress could make that delegation. The District Court asserted that the Agreements might constitute contracts between the United States and the railroads because they granted the railroads relief from their passenger service obligations, and because only the United States actually could grant such relief. 577 F. Supp., at 1051. But a careful reading of the RPSA indicates that the Act, and not the Basic Agreements, actually removed that responsibility. Accordingly, we find unpersuasive the railroads' efforts to demonstrate that the United States is contractually bound, either through the RPSA or the Basic Agreements, not to reimpose any rail passenger service obligations.

Because, as we have demonstrated, neither the Act nor the Basic Agreements created a contract between railroads and the United States, our focus shifts from a case in which we confront an alleged impairment, by the Government, of its own contractual obligations, to one in which we face an alleged legislative impairment of a private contractual right. We therefore have no need to consider whether an allegation of a governmental breach of its own contract warrants application of the more rigorous standard of review that the railroads urge us to apply.[24] Instead, we turn to consider

---

[24] This Court once observed:

"There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements . . . . To say that the Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has

whether the payment obligation in § 405(f) of the Act unconstitutionally impairs the private contractual rights of the railroads.

## C

To prevail on a claim that federal economic legislation unconstitutionally impairs a private contractual right, the party complaining of unconstitutionality has the burden of demonstrating, first, that the statute alters contractual rights or obligations. See *United States Trust Co.* v. *New Jersey*, 431 U. S., at 17–21. If an impairment is found, the reviewing court next determines whether the impairment is of constitutional dimension. If the alteration of contractual obligations is minimal, the inquiry may end at this stage, *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234, 245 (1978); if the impairment is substantial, a court must look more closely at the legislation, *ibid.;* see also *Energy Reserves Group, Inc.*, 459 U. S., at 411. When the contract is a private one, and when the impairing statute is a federal one, this next inquiry is especially limited, and the judicial scrutiny quite minimal. The party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and "'establish that the legislature has acted in an arbitrary and irrational way.'" *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 729 (1984) (quoting *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S., at 15).[25]

---

given no sanction to such a conception of the obligations of our Government." *Perry* v. *United States*, 294 U. S. 330, 350–351 (1935).

Thus, the Court has observed that in order to maintain the credit of public debtors, see *Lynch* v. *United States*, 292 U. S. 571, 580 (1934), and because the "State's self-interest is at stake," *United States Trust Co.* v. *New Jersey*, 431 U. S. 1, 26 (1977), the Government's impairment of its own obligations perhaps should be treated differently. See also *Allied Structural Steel Corp.* v. *Spannaus*, 438 U. S. 234, 244, n. 15 (1978). It is clear that, where the Government is not a party to the contract at issue, these concerns are not implicated, and there is no reason to argue for a heightened standard of review.

[25] When the court reviews state economic legislation the inquiry will not necessarily be the same. As we made clear in *Pension Benefit Guar-*

The starting point for our inquiry is therefore whether the 1979 and 1981 pass-rider amendments impaired the private contractual rights that the railroads obtained under the Basic Agreements.[26] We must first consider what rights vested in the railroads pursuant to the Basic Agreements and then examine the way in which the 1979 and 1981 amendments altered those rights.[27]

The only right that the railroads obtained under the Basic Agreements was the right to be relieved of the pre-existing responsibilities they had as regulated common carriers. The RPSA expressly permitted the railroads to divest themselves of, and authorized Amtrak to assume, all the railroads' "responsibilities as a common carrier of passengers by rail in intercity rail passenger service *under [Subtitle IV of Title 49] or any State or other law relating to the provision of intercity rail passenger service.*" 45 U. S. C. § 561(a)(1) (1970 ed.) (emphasis added). In turn, the Basic Agreements relieved the railroads of their "entire responsibility for the provision of Intercity Rail Passenger Service." § 2.1, App. 13. Thus the statute and the Basic Agreements together relieved the

---

*anty Corporation* v. *R. A. Gray & Co.*, 467 U. S., at 732–733, we have never held that the principles embodied in the Fifth Amendment's due process guarantee are coextensive with the prohibitions against state impairment of contracts under the Contract Clause, and, we observed, to the extent the standards differ, a less searching inquiry occurs in the review of federal economic legislation. See also n. 24, *supra* (discussing the standard for reviewing claims of a government's impairment of its own contractual obligations).

[26] We address first the 1979 and 1981 amendments, the issue raised on appeal, and postpone to Part III discussion of the 1972 amendment, the issue raised on cross-appeal.

[27] The RPSA established that contracts entered into by the corporation would be governed by the law of the District of Columbia. In the District of Columbia, courts determine as a matter of law whether a contract or its provisions are ambiguous—that is, whether they are reasonably susceptible of different interpretations. *Kass* v. *William Norwitz Co.*, 509 F. Supp. 618, 623–624 (DC 1980). The Court of Appeals ruled that the Basic Agreement was not ambiguous. 723 F. 2d, at 1301. As the following analysis makes clear, we agree.

railroads only of common carriage responsibilities they had by virtue of federal or state law. Moreover, Amtrak had no independent authority to relieve the railroads of obligations imposed by Congress, and it is readily apparent that Congress limited its relief to the previously imposed obligation to operate intercity rail passenger trains.

The railroads do not and could not allege that as common carriers they ever had the responsibility, by statute or regulation, to provide free passes or reduced fares for their employees and their dependents. Here, as in the lower courts, they describe the provision of passes as a "gratuitous undertaking, like providing a 'Christmas turkey.'" 577 F. Supp., at 1051. It plainly is not consistent with the nature of relief provided the railroads under the Basic Agreements to include, within the scope of the contract, relief from the "gratuitous undertakings" of providing free and reduced-fare passes. Nor did the provision of free or half-fare passes become a "responsibility" within the meaning of the statute because some railroads, although not the parties here, did not simply offer the passes as noncontractual fringe benefits, but instead were required to provide passes pursuant to their collective-bargaining agreements. The Basic Agreements did not purport to relieve the railroads of their employee obligations under collective-bargaining agreements, and in fact the Act expressly required the railroads to continue to assume their responsibilities under collective-bargaining agreements. 45 U. S. C. § 565(b) (1970 ed.) (a railroad shall make provision for "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) to such employees under existing collective-bargaining agreements").

We therefore find that the Basic Agreements in no respect relieved the railroads of the "responsibility" to provide their employees with pass privileges, for no state or federal law imposed that "responsibility" on them, in connection with intercity rail passenger operations, when the contracts were

executed. The Basic Agreements did not address this payment obligation but instead left the reimbursement issue completely open. It was not until after the Basic Agreements were signed, and Amtrak operations were under way, that Congress decided to impose new obligations on both parties to the agreements. We therefore conclude that § 405(f) in no respect altered, substantially or otherwise, the railroads' existing contractual rights and duties.

## D

The Court of Appeals concluded that, while the Basic Agreements might not expressly have relieved the railroads of the obligation to reimburse Amtrak for pass riders, they did relieve the railroads of all responsibility—both operational and financial—for intercity rail passenger service. 723 F. 2d, at 1302. But because the railroads were required by the 1979 and 1981 amendments to pay Amtrak more than its incremental costs, the court reasoned that some portion of the railroads' payments might go to cover Amtrak's operational expenses. In that way, the railroads would indirectly be providing the rail passenger service from which they were to have been contractually freed, and Congress' decision to require such payments might therefore violate the railroads' contractual right to be free of the responsibility to provide intercity rail service. The court then considered whether the impairment was unconstitutional and concluded that *Amtrak* had failed to meet *its* burden of proving that the amendments were "paramount to the rights of the railroads under the basic agreement." *Id.*, at 1303. The court held that the 1979 and 1981 amendments "unreasonably and illegally" impaired the rights of the railroads under the Basic Agreements by indirectly requiring the railroads to help Amtrak finance aspects of its operations that once were part of the railroads' responsibility. *Ibid.*

Initially, it is far from evident that the railroads have a private contractual right to be free from all obligations

476

to make financial payments to subsidize Amtrak, which is the way in which the railroads view any payments in excess of Amtrak's incremental costs.   The railroads were unambiguously relieved only of burdensome intercity rail responsibilities imposed by the federal and state common carrier regulatory schemes.   But even if the Basic Agreements relieved the railroads of the obligation to subsidize Amtrak, they surely did not exempt the railroads from financial obligations to Amtrak of other kinds, and the railroads misdirect their attack when they assert a right to be free from subsidizing Amtrak.   The issue in these cases is not whether the railroads have a right against subsidizing Amtrak, for here Congress has simply required the railroads to pay for the value of a benefit their employees receive from Amtrak. Nothing in the Basic Agreements lifted from the railroads the responsibility to pay Amtrak for the pass-rider privileges it accords their employees, and nothing gave the railroads a right to special privileges in the pricing of Amtrak services. Whether at some point the amount the railroads are required to pay might be so unreasonably high as to constitute a subsidy we need not decide, for as we demonstrate *infra* Congress acted rationally in setting the value of the pass to the employees.   We therefore disagree with the Court of Appeals' conclusion that Congress impaired a private contractual right simply by passing amendments that required the railroads to pay for a service rendered.   Having reached this conclusion, we of course need not consider whether the impairment is substantial.

Even were the Court of Appeals correct that the railroads have a private contractual right not to pay more than the incremental cost of the passes, we disagree with the Court of Appeals' conclusion that the Due Process Clause limited Congress' power to choose a different reimbursement scheme in these cases.   Under the Fifth Amendment's Due Process Clause, Congress remained free to "'adjus[t] the burdens and benefits of economic life,'" as long as it did so in a manner

that was neither arbitrary nor irrational. *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S., at 729 (quoting *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S., at 15). Moroever, in the determination of whether economic legislation that substantially alters contractual rights and duties violates due process, the burden of proving irrationality rests squarely on the party asserting a due process violation. 467 U. S., at 729. When it performed this due process inquiry, the court below erred both in placing the burden of proof on Amtrak to defend the legislation and in defining the standard of review as rigorously as it did.

Had it applied the correct standard, the Court of Appeals would have found that the railroads have not met their burden of proof. In passing § 405(f), Congress rationally required Amtrak to honor the expectations of the railroads' past and present employees and their dependents. It rationally took this step to maintain employee morale and labor peace, and it rationally required the railroads to pay at least a portion of the cost of the privileges, both because the railroads, rather than the taxpayers, were responsible for the creation of the moral obligation to the railroad employees and retirees, and because the railroads benefited from labor peace and continued employee morale.

Similarly, after reasonably requiring the railroads to reimburse Amtrak for benefits received, Congress acted wholly rationally in selecting the value to the passholders—as opposed to the cost to Amtrak—as the proper reimbursement amount, and in settling on the 25-percent figure to quantify the value received. It commissioned a study by the GAO, which concluded that several different computations of cost made sense, and that the selection of no one cost-spreading scheme was more inherently rational or fair than any other. App. 80–81. At this point, the decision was uniquely one for Congress, which had absolutely no obligation to select the scheme that a court later would find to be the fairest, but simply one that was rational and not arbitrary. Congress

placed a value on the free passes that reasonably relates to the normal fares of the public, and "[w]e are unwilling to assess the wisdom of Congress' chosen scheme . . . . It is enough to say that the Act approaches the problem of cost spreading rationally; whether a [different] cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Turner Elkhorn, supra,* at 18–19. We therefore conclude that the 1979 and 1981 amendments in no respect offend the Due Process Clause.

Having concluded that the Basic Agreements relieved the railroads only of the direct and onerous responsibilities they had borne as common carriers, and having further concluded that the provision of free and partial-fare passes was not among those responsibilities, we conclude that the 1979 and 1981 amendments to the Act did not impair private contractual rights acquired by the railroads as parties to the Basic Agreements. The amendments imposed new obligations on the railroads and in no respect infringed the railroads' existing contractual rights. But even if the payment of more than the incremental cost of pass privileges indirectly subsidizes Amtrak operations in violation of a private contractual right, Congress' decision to assess the railroads is rational and reasoned, and the railroads have failed to demonstrate a due process violation. We therefore reverse the Court of Appeals insofar as it ruled to the contrary.

## III

The foregoing analysis *a fortiori* requires us to reject the railroads' argument on cross-appeal that they have a contractual right to be free from the obligation to make any payments to Amtrak, even for incremental costs. Absolutely nothing in the RPSA or the Basic Agreements suggests that the railroads were relieved of the responsibility to reimburse Amtrak for the costs of providing to the railroads' employees

and retirees, and their dependents, the free passes that the railroads had traditionally provided to them.

## IV

Accordingly we hold that § 405(f) of the RPSA is constitutional, and we reverse the Court of Appeals insofar as it held that the 1979 and 1981 amendments to the Act contravened the Due Process Clause.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of these cases.