# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-1459

_____

Kirk Koster; Martin Lopez; Warren
Beine; Mike Collins; Jeff
Goodsman; Nate Hopkins; James
Connell, on behalf of themselves
and all others similarly situated,

          Appellants,

v.

City of Davenport, Iowa; City of
Bettendorf, Iowa; City of
Muscatine, Iowa; City of Clinton,
Iowa; City of Iowa City, Iowa,

          Appellees.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
Southern District of Iowa.

_____

Submitted: January 15, 1999

Filed: July 7, 1999

_____

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

HANSEN, Circuit Judge.

Appellants, vested members of the Iowa statewide fire and police retirement
system (statewide plan), sought injunctive and declaratory relief as well as money

damages against the appellee cities, which are participating employers in the statewide plan. The appellant members claim that the cities violated their federal and state constitutional rights by using statewide plan assets to offset the cities' future contributions to the statewide plan. The district court[1] granted summary judgment in favor of the cities on the members' constitutional claims and on their pendent state law claims. The members appeal, and we affirm.

## I.

Prior to 1992, Iowa cities maintained their own local pension plans for police and fire employees. Each of the separate municipal plans in question was a defined benefit plan. The employees contributed a set percentage of their compensation, while the city's contribution varied to meet the funding requirements of the plan. A "defined benefit plan" predetermines the amount of a participating member's retirement benefits, generally based on a percentage of the member's compensation. See, e.g., Iowa Code § 411.6(2)(c) (1997) (paying up to sixty percent of the member's average final compensation). The employer bears the risk of market fluctuation in a defined benefit plan. The employer must fund the plan to meet the actuarially-determined pension liability of covered members regardless of the market performance of the fund. If the fund performs poorly, the employer must make up the deficiency by contributing more to the fund; if the market performs well, the employer reaps the benefit in lower contributions. The employee is entitled to the predetermined benefit regardless of the amount of contributions made to fund the plan. In contrast, "a defined contribution" plan entitles the member to the amount in his individual account at the time of his retirement, which equals the contributions made to the account plus or minus the investment's market fluctuations. See generally, 2 MARK A. ROTHSTEIN ET AL., EMPLOYMENT LAW § 11.2, at 431-33 (1994).

---

[1] The Honorable Charles R. Wolle, then Chief Judge, United States District Court for the Southern District of Iowa.

Effective January 1, 1992, the Iowa legislature revised Iowa Code chapter 411 and created a centralized statewide pension plan to replace the local municipal plans. See Iowa Code § 411.2. All of the local police and firefighter municipal plans merged into the statewide plan. The new statewide plan is also a defined benefit plan. See Iowa Code § 411.6. At the time of the conversion to the statewide plan, the plan's actuary determined that each of the appellee cities' plans was over-funded. Chapter 411 allowed each city to use the excess funds to offset either the employees' and city's future contributions to the statewide plan or only the city's future contributions to the plan. See id. § 411.38(4). Each appellee city chose to use its excess to fund only the city's future contributions. If the actuary had determined that any separate municipal plan was under-funded at the time it was transferred to the statewide plan, the statute required that city to pay additional amounts to properly fund its share of the statewide plan. See id. § 411.38(1)(b).

The plaintiff members brought their claim against the cities under 42 U.S.C. § 1983, alleging that the cities' decisions under section 411.38(4) to use the excess funds to reduce only the cities' future contributions (as opposed to reducing both the cities' and the members' future contributions) violated their federal and state constitutional rights. They argue that the cities (1) impaired their constitutional right to contract; and (2) unconstitutionally deprived them of their property interest in the funds without due process of law.[2] The cities' use of the excess funds allegedly reduced the value of the

---

[2]The members asserted at oral argument that they have maintained their Fifth Amendment Takings without just compensation claim on appeal. Given the complexity of a Takings claim in relation to a statutory regime, see Eastern Enter. v. Apfel, 118 S. Ct. 2131, 2155 (1998) (Kennedy, J., concurring in the judgment); id. at 2162 (Breyer, J., dissenting), and the lack of briefing on the issue, we decline to address the claim here. Additionally, our holding that the statute does not violate substantive due process makes it unlikely that a Takings claim would be successful. See Connelly v. Pension Benefit Guar. Corp., 475 U.S. 211, 223 (1986) (noting that where a statute has passed

members' benefits under the plan, compromised the soundness of the plan, and violated the plan requirement that the funds be used for the exclusive benefit of the members. The members also brought state law claims of breach of statutory and common law trust duties, seeking equitable remedies in the form of a constructive trust. The district court granted the cities' motion for summary judgment, finding that the statute was constitutional and did not violate state trust laws. The members appeal.

## II.

We review de novo the district court's grant of summary judgment and apply the same standards applied by the district court. See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997). Because the facts in this case are undisputed, we limit our inquiry to whether the cities are entitled to judgment as a matter of law. See American Family Mut. Ins. Co. v. Van Gerpen, 151 F.3d 886, 887 (8th Cir. 1998).

## A.    Contract Clause[3]

The United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. CONST. art. I, § 10, cl. 1. When reviewing the members' contention that section 411.38(4) (permitting the cities to choose how to allocate excess funds) impermissibly impairs their constitutional right to contract, we must focus on "whether the change in state law has 'operated as a substantial impairment of a contractual relationship.'" General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S.

_____

muster under the due process clause, "it would be surprising indeed to discover" that the same statute constituted an unconstitutional taking).

[3]Iowa constitutional impairment of contracts claims follow federal principles, see Des Moines Joint Stock Land Bank v. Nordholm, 253 N.W. 701, 709 (Iowa 1934), and thus, we do not address the state contract impairment issue separately.

234, 244 (1978)). The modern Contract Clause analysis involves three components: "(1) Does a contractual relationship exist, (2) does the change in the law impair that contractual relationship, and if so, (3) is the impairment substantial?" Honeywell, Inc. v. Minnesota Life and Health Ins. Guar. Assoc., 110 F.3d 547, 551 (8th Cir.) (en banc) (citing Romein, 503 U.S. at 186), cert. denied, 118 S. Ct. 156 (1997). If a substantial impairment of a contractual relationship exists, the legislation nonetheless survives a constitutional attack if the "impairment is . . . justified as 'reasonable and necessary to serve an important public purpose.'" Parella v. Retirement Bd. of the R.I. Employees' Retirement Sys., 173 F.3d 46, 59 (1st Cir. 1999) (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 25 (1977)). See also, Honeywell, 110 F.3d at 551.

A statutory enactment is generally presumed not to create "contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." National R.R. Passenger Corp. v. Atchison, Topeka & Sante Fe Ry, 470 U.S. 451, 456-66 (1985) (quotations omitted). See also Honeywell, 110 F.3d at 552. The language and circumstances of the statute must evince a clear intent by the legislature to create contractual rights so as to bind the state. See Honeywell, 110 F.3d at 557 (Loken, J., concurring) (finding the use of the word "guarantee" in the statute at issue to evince such an intent); see also Parella, 173 F.3d at 60 ("[S]tate statutory enactments do not of their own force create a contract with those whom the statute benefits.") (internal quotations omitted).

Chapter 411's stated purpose "is to promote economy and efficiency in the municipal public safety service by providing an orderly means for police officers and fire fighters to have a retirement system which will provide for the payment of pensions." Iowa Code § 411.1A. Nowhere in the statute is the word "contract" mentioned. Once a participating member becomes vested in the retirement system, his benefits cannot be taken away. See id. § 411.6(1)(b) ("Any member who has been a member of the retirement system four or more years . . . shall upon attaining retirement age, receive a service retirement award . . . .") (emphasis added). See also Lage v. City

5

of Marshalltown, 235 N.W. 761, 763 (Iowa 1931) ("It is settled in this . . . jurisdiction[], . . . that upon the happening of the event which entitles a police officer or fireman to a pension, his right thereto then becomes immediately vested and may not be taken away."). Despite the plan's vesting mechanism, the Supreme Court of Iowa has determined that the police officers' and fire fighters' rights under the retirement system are statutory rather than contractual. See Lage, 235 N.W. at 763 ("[T]he duty to provide a fund with which to pay the pensions due is purely statutory and not contractual."); see also Grandia v. City of Oskaloosa, 405 N.W.2d 849, 852 (Iowa 1987) (characterizing Lage as "holding that a statute providing for a pension may be modified or even repealed by the legislature"). Other circuit courts have found that statutorily-created state pension plans are not contractual in nature for purposes of the federal Contract Clause because the statutes lacked a clear indication that the legislature intended to create contractual rights. See, e.g., National Educ. Ass'n-R.I. v. Retirement Bd. of the Retirement Sys., 172 F.3d 22, 26, 28 (1st Cir. 1999) (differentiating between vested rights and contractual rights and finding no contractual right in the Rhode Island state pension plan because the statute did not use the term "contract" and did not have an anti-retroactivity clause regarding future benefit changes); Parker v. Wakelin, 123 F.3d 1, 7-9 (1st Cir. 1997) (finding no contractual right in Maine's public pension plan and noting the need for a close scrutiny of individual state plans due to the vast differences in public pension plans from state to state), cert. denied, 118 S. Ct. 1675 (1998).

The question of whether a state statute creates a contract for purposes of the Contract Clause under the U.S. Constitution is a federal question, and as such, we are not bound by a state court's assessment of the issue, though we do accord it "'respectful consideration and great weight.'" Honeywell, 110 F.3d at 552 (quoting Romein, 503 U.S. at 187). We choose not to answer this complex constitutional question, however, as we conclude that even if Chapter 411 created a contractual relationship, section 411.38(4) does not substantially impair it.

The Supreme Court has looked at various factors to determine whether an alleged contractual impairment was substantial, including whether the impaired term is central to the contract, whether the impairment disrupts the parties' settled expectations, and whether the parties reasonably relied on the impaired right. See Honeywell, 110 F.3d at 558 (Loken, J., concurring). Generally, the more heavily regulated the industry, the less reasonable it is to expect that contractual relationships will not be altered by legislation. See id.

The members allege that section 411.38(4) impairs their contractual rights by allowing the cities to use the excess funds to the cities' benefit, contrary to the plan provision that requires all plan funds to be used for the exclusive benefit of the members. However, a defined benefit plan entitles the members to a predetermined distribution upon retirement and to an actuarially sound plan to ensure that the plan is adequately funded to meet those distribution requirements. It does not entitle them to any use of the contributions other than to ensure the above entitlements are met. Using the excess funds to offset future city contributions is not inconsistent with the requirement of using the plan assets for the exclusive benefit of the members. Cf. Claypool v. Wilson, 6 Cal.Rptr.2d 77, 93 (Cal. Ct. App.) (finding that the legislative repeal of cost of living adjustment (COLA) programs and the subsequent use of the prior COLA funds to offset employer contributions to the state pension plan did not divert the funds from the system and actually maintained the funds for the exclusive benefit of the plan's members), cert. denied, 506 U.S. 1034 (1992).

The members also allege that this use of the excess funds reduced the value of their benefits under the plan and compromised the soundness of the plan. Again, we note that this is a defined benefit plan; the members are entitled to a predetermined benefit, not to the contributions made on their behalf. The statute required the plan's actuary to first determine that the assets transferred from each separate plan to the statewide plan were more than adequate to meet that plan's accrued liabilities before allowing the city to offset its future contributions. See Iowa Code §§ 411.38(2), (4).

7

Thus, the statute does not infringe on the members' rights to receive predefined benefits upon retirement and provides measures to ensure that the statewide fund remains sound. Cf. Valdes v. Cory, 189 Cal.Rptr. 212, 223 (Cal. Ct. App. 1983) ("Absent actuarial input from the Board . . . legislative action randomly and unilaterally cancelling or decreasing otherwise continuously appropriated, periodic employer contributions clearly interferes with vested contractual rights of PERS members.") (emphasis added); Claypool, 6 Cal.Rptr.2d at 92-93 (finding no impairment of contracts and distinguishing Valdes on the basis that before acting, the legislature first determined that the use of the prior COLA funds to offset future employer contributions would not jeopardize the soundness of the state pension fund). If there is any impairment to the members' alleged contractual rights, we conclude that it is not central to the claimed contract because it does not diminish the value of the members' benefits or compromise the soundness of the plan.

We likewise conclude that if indeed there is an impairment, it does not affect the parties' expectations or reliance interests. Under the former municipal plans, each city's contribution varied while the members' contributions remained constant. Each city made up any shortfalls in the actuarial soundness of its plan by contributing more to the plan in any given year that the plan's actuary determined the plan to be under-funded. Likewise, each city contributed less in years that the actuary determined the plan to be overfunded. All the while, the members' contributions remained constant. Thus, the members had and could have no reasonable expectation that this aspect of the plan will change and have no reasonable expectation that any excess funds will be used to offset their own future contributions. The members make no showing that they relied on the ability to use the excess funds in this manner. If in fact the change in legislation impaired the members' asserted contract rights, any impairment was not substantial.

8

**B.    Due Process**[4]

Substantive due process claims regarding economic legislation face a highly deferential rational basis test. See Parrish v. Mallinger, 133 F.3d 612, 614-15 (8th Cir. 1998); Honeywell, 110 F.3d at 554-55. "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976). The Supreme Court recently confirmed its reluctance to use the vague contours of the Due Process Clause to invalidate economic legislation. See Eastern Enter., 118 S. Ct. at 2153 (plurality opinion) (of the five justices finding the Coal Industry Retiree Health Benefit Act unconstitutional, four justices relied on the Takings Clause and only Justice Kennedy found the legislation unconstitutional under the Due Process Clause); id. at 2159 (Kennedy, J., concurring in the judgment and dissenting in part) ("Statutes may be invalidated on due process grounds only under the most egregious circumstances."); id. at 2164 (Breyer, J., dissenting) (the Due Process Clause protects only against fundamentally unfair applications of law).

The members complain that section 411.38(4) allows the cities to take the members' property interests in the pension plan without due process of law. Initially, we reiterate that the members' interests in the plan are limited to their predefined benefits and the assurance of a sound plan. Presuming that these interests are "property" for purposes of our due process analysis, see Honeywell, 110 F.3d at 554 (indicating that vested rights are treated similar to contractual rights for purposes of the Due Process clause), the members fail to show how their interests were adversely

_____

[4] Iowa constitutional due process claims follow federal principles, see State v. Miner, 331 N.W.2d 683, 688 (Iowa 1983), and thus, we do not address the state due process claim separately.

affected, or "taken." Though the members allege that the cities' actions reduced the value of their benefits, they provide no support for such a contention. They are still entitled to their predetermined benefits upon retirement. Additionally, they fail to provide evidence that the soundness of the plan is compromised by using the excess funds from the separate plans to offset only the cities' future contributions. As explained above, the statute provided a mechanism to ensure the continued soundness of the plan.

We point out that the cities are not free to use the excess funds for just any purpose–the funds must be used only to offset future contributions, and thus are still dedicated to preserving the soundness of the members' pension plan. The Iowa legislature sought to avoid allowing one overfunded municipal plan to subsidize another underfunded municipal plan upon consolidation into the statewide plan. See Iowa Code § 411.38(2). This scheme is not only rational, it may have been necessary to sustain the same trust provisions that the members claim are being violated. See Municipality of Anchorage v. Gallion, 944 P.2d 436, 444 (Alaska 1997) (finding that the use of overfunding in one state pension plan to augment a separate underfunded state plan violated the state constitution, which requires public pension plan funds to be used for the exclusive benefit of its beneficiaries). Due to the nature of a defined benefit plan, each city bore the risk and reaped the benefit of market fluctuations, which in turn created any excess funding that existed at the time of the consolidation. For municipal plans that the actuary determined to be underfunded, the statute required the responsible city alone to make up the difference. See Iowa Code § 411.38(1)(b). We conclude that the Iowa legislature acted rationally in allowing each city to choose to use the excess funds to offset only its own future contributions, and that the members suffered no fundamental unfairness.

## C.    State Remedies

Our constitutional holdings allow us to easily dispose of the members' state law

10

claims seeking imposition of a constructive trust based on unjust enrichment. A constructive trust in Iowa is an equitable remedy and is appropriate in three instances: actual fraud, constructive fraud, or equitable principles other than fraud. See In re Estate of Peck, 497 N.W.2d 889, 890 (Iowa 1993). The members must prove their entitlement to a constructive trust by "clear, convincing, and satisfactory evidence." Neimann v. Butterfield, 551 N.W.2d 652, 654 (Iowa Ct. App. 1996).

The members agree that the cities have not engaged in either actual or constructive fraud. (See Appellants' Br. at 29.) They also concede that the cities' actions are facially valid under the statute. We end with the underlying contention with which we started. The statewide plan is a defined benefit plan. As such, it entitles the members to predetermined benefits at retirement and to a sound plan to ensure receipt of those benefits. Because the cities bear the risk of market fluctuations, and because their use of the excess funds does not compromise the soundness of the plan, the cities' use of the excess funds to offset only their own future contributions does not unjustly enrich the cities at the expense of the members. The district court correctly granted summary judgment in favor of the cities.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

11