364 F.Supp.2d 1046 (2005)
Dwight L. QUINN, Freida Eyster Martin, and David W. Kuneman, Plaintiffs,
v.
BJC HEALTH SYS., Barnes-Jewish Hospital, American Hospital Ass'n Defendants.
No. 4:04CV00768 ERW.
United States District Court, E.D. Missouri, Eastern Division.
March 1, 2005.
*1047 *1048 Anthony L. Dewitt, Edward D. Robertson, Jr., James R. Bartimus, Mary Doerhoff Winter, Bartimus and Frickleton, PC, Jefferson City, MO, Harry Huge, Harry Huge Law Firm, LLP, Charleston, SC, Maurice B. Graham, Robert F. Ritter, Don M. Downing, Gray, Ritter and Graham, P.C., St. Louis, MO, for Plaintiffs.
John Michael Clear, Leonardo J. Asaro, Stephen D. Feldman, Bryan Cave LLP, St. Louis, MO, Catherine E. Stetson, Christopher R. Zaetta, Edward C. Crooke, Mitchell E. Zamoff, Ty Cobb, Hogan and Hartson, Washington, DC, for Defendants.

MEMORANDUM AND ORDER
WEBBER, District Judge.
This matter is before the Court upon American Hospital Association's Motion to Dismiss [doc. # 33], BJC HealthCare and Barnes-Jewish Hospital's Motion to Dismiss [doc. # 37], BJC HealthCare and Barnes-Jewish Hospital's Motion to Dismiss, or, in the Alternative, for Summary Judgment with Respect to Plaintiff Quinn [doc. # 39], and BJC HealthCare and Barnes-Jewish Hospital's Motion for Partial Summary Judgment with Respect to Plaintiff Kuneman [doc. # 42].
I. FACTUAL AND PROCEDURAL BACKGROUND
This is one of numerous cases filed in various federal district courts across the nation by certain uninsured patients against certain not-for-profit medical institutions. [1] *1049 This case was originally initiated by Plaintiff Dwight L. Quinn ("Plaintiff Quinn"), a Missouri resident, against BJC HealthCare ("BJC"), a Missouri-based charitable hospital system, and John Does 1-10 on June 22, 2004.[2] An Amended Complaint was subsequently filed on July 22, 2004, adding Plaintiff Freida Eyster ("Plaintiff Eyster"), Plaintiff David W. Kuneman ("Plaintiff Kuneman"), Defendant Barnes-Jewish Hospital ("Barnes"), and Defendant American Hospital Association ("AHA").[3] Barnes is a not-for-profit hospital, located in the City of St. Louis and affiliated with Defendant BJC (collectively, "BJC/Barnes"). AHA, headquartered in Chicago, Illinois, is a national organization representing and serving hospitals and health care networks.
In the Amended Complaint, Plaintiff Quinn alleges that he was admitted to Barnes, remained for a period of five days, and underwent surgery for angioplasty and arterial stents during his hospitalization in January, 1996. When he was admitted, Plaintiff Quinn believed he was covered by insurance; however, during the course of his stay in the hospital, he was informed that he was not covered by insurance. After his stay, Plaintiff Quinn was contacted repeatedly in an effort to collect payment for the services that had been rendered during his stay. On June 23, 1999, Barnes filed a lawsuit in the Circuit Court of the City of St. Louis, seeking to collect Plaintiff Quinn's unpaid medical bills for the medical treatment rendered from January 26, 1996, to June 16, 1997. On August 9, 2001, Barnes obtained a default judgment against Plaintiff Quinn in the amount of $63,308.06, plus court costs. Barnes Hospital, Inc., v. Dwight L. Quinn, No. 992-01591 (Mo.Cir.Ct. Aug. 9, 2001). Plaintiff Quinn alleges that his credit history is ruined as a result of the judgment against him.
Plaintiff Eyster alleges that she went to the emergency room at Barnes with chest pains on December 31, 2003, and had several tests performed during her thirty-six hour stay at Barnes. At the time of her admission, Plaintiff Eyster told the intake worker that she was not covered by insurance. During her stay, it was determined that an additional stress test should be performed. When she told the physician that she did not have insurance and asked how much the test would cost, the physician told her that he did not think she needed the test if she did not have insurance. Plaintiff Eyster was told that her pain was due to arthritis and she was released from the hospital thereafter. She continued to experience chest pains and sought treatment from another facility approximately two months later. She was diagnosed with super ventricular tachardia and a mineral deficiency. Barnes allegedly billed Plaintiff Eyster $8,944.55. Eyster has made monthly payments of $100.00 toward her total bill. Barnes admits having received $500.00 from her.
Plaintiff Kuneman alleges that he was insured by United Healthcare until January, 2001. Prior to January, 2001, he had certain tests performed at Barnes-Jewish laboratories and was charged $156.00. On June 8, 2001, the same tests were again *1050 performed. Plaintiff Kuneman was charged $348.00 for these tests. On July 19, 2001, Plaintiff Kuneman inquired of two other laboratories, Glaxo Smithkline and Quest, to obtain quotes for the same laboratory tests. He was quoted a fee of $137.10, and the quote was made with the knowledge that Plaintiff Kuneman was not insured. Through correspondence with BJC, Plaintiff Kuneman has learned that BJC charges uninsured patients a higher rate than it charges insured patients.
II. STANDARD OF REVIEW: MOTION TO DISMISS
A complaint shall not be dismissed for failure to state a claim upon which relief can be granted unless it appears beyond doubt that the plaintiff cannot prove any set of facts which would entitle him to relief. Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 740 (8th Cir.2002). In considering a motion to dismiss, the Court takes all allegations in the complaint as true and views the facts most favorably to the non-moving party. Wisdom v. First Midwest Bank, of Poplar Bluff, 167 F.3d 402, 405 (8th Cir.1999).
A plaintiff is only required to set forth sufficient facts to provide notice of the basis for the claims alleged. Fed.R.Civ.P. 8. The complaint should not be dismissed merely because the court doubts that a plaintiff can prove all of the necessary factual allegations. Krentz v. Robertson, 228 F.3d 897, 905 (8th Cir.2000). Thus, as a practical matter, a dismissal under Rule 12(b)(6) should be granted only in the unusual case where a plaintiff includes allegations showing, on the face of the complaint, that there is some insuperable bar to relief. Stone Motor Co. v. General Motors Corp., 293 F.3d 456, 465 (8th Cir.2002).
III. DISCUSSION
Plaintiffs bring a mixture of federal and state law claims in their ten-count Amended Complaint. With respect to the federal claims, the crux of Plaintiffs' argument is that they are entitled to monetary damages and other equitable relief based on their status as third-party beneficiaries of a contract formed between BJC/Barnes and the federal government. The Court will address the federal claims before addressing the state claims.
A. Federal Law Claims
1. Count One: Third Party Breach of Contract
In Count One, Plaintiffs allege that BJC/Barnes entered into an express and/or[4] implied contract with the federal government pursuant to 26 U.S.C. § 501(c)(3)[5] and with the Missouri government pursuant to "Chapter 355 RSMO."[6] *1051 The Amended Complaint alleges that the basic obligations under this agreement were as follows: in return for certain tax exemptions, BJC/Barnes would operate exclusively for charitable purposes, provide certain care, and refrain from certain actions. Plaintiffs allege that they are third-party beneficiaries of these contracts and that BJC/Barnes breached these contracts by failing to provide certain care and by engaging in certain prohibited practices, causing Plaintiffs to suffer economic injury and other damages.
In their briefing on this issue, Plaintiffs reason that "the contract between BJC and the United States is founded on the government's decision to forgo tax revenue in return for BJC's agreement to provide significant charitable health care services to the medically indigent." Pls.' Resp. at 7. Defendants BJC/Barnes counter that "the decided cases uniformly reject the notion that tax laws or tax exemptions create enforceable contracts" and that "§ 501(c)(3) does not require the provision of free medical care to the indigent as a `condition for obtaining tax exempt status.'" Defs.' Rep. at 2, 5. Plaintiffs' federal law allegations are premised on the existence of an express or an implied agreement with the federal government pursuant to § 501(c)(3) that, in return for a tax-exempt status, BJC/Barnes would undertake certain actions. Plaintiffs' allegations are also dependent on their status as third-party beneficiaries of this alleged agreement.
The notion that the Federal Income Tax is contractual in nature has been rejected repeatedly by the courts. See McLaughlin v. Comm'r, 832 F.2d 986, 987 (7th Cir.1987). Thus, this Court has found no case in which the grant of an exemption pursuant to § 501(c)(3) was found to create a contractual relationship between the federal government and the tax-exempt entity. "[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights.... This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state." Nat'l RR Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co., 470 U.S. 451, 465-66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (internal quotation and citations omitted). Nothing in the text of § 501(c)(3) or any interpretative caselaw supports Plaintiffs' theory that § 501(c)(3) imposes a contractual relationship between not-for-profit hospitals and the federal government. Further, the text of § 501(c)(3) contains no rights-creating language which might indicate Congress's intent that any alleged contract be enforced by members of the general public.
Other district courts which have recently decided this issue are in unanimous agreement regarding this lack of contractual relationship. As one court noted, "[t]he assertion that [Plaintiffs] have an implied right of action under § 501(c)(3) is extraordinary given the fact that the Supreme Court has counseled against construing a statute as creating a contractual relationship." Burton v. William Beaumont Hosp., 347 F.Supp.2d 486, 493 (E.D.Mich.2004) (citing Nat'l RR Passenger Corp., 470 U.S. at 465-66, 105 S.Ct. 1441); see also Washington v. Med. Ctr. of Cent. Ga., Inc., No. 5:04CV185(CAR), slip op. at 5 (M.D.Ga. Jan. 21, 2005) (finding no contractual relationship); Hudson v. Cent. Ga. Health Servs., No. 5:04CV301(DF), slip op. at 7 (M.D.Ga. Jan. 13, 2005) (finding no contract); Ferguson v. Centura Health Corp., 358 F.Supp.2d 1014, 1016 (D.Colo.2004) (argument "patently untenable"); Darr v. Sutter Health, 2004 WL 2873068, at *4 (N.D.Cal. Nov. 30, 2004) ("Plaintiffs do not point to any contractual provisions appearing within Section *1052 501(c)(3), nor any language within the statute that defines the contours of a contractual obligation."). In sum, "[n]o court has ever held that 501(c)(3) creates a binding contract." Lorens v. Catholic Health Care Partners, 356 F.Supp.2d 827, 831 (N.D.Ohio 2005).
As a matter of law, Plaintiffs have failed to state a federal law claim under Count One. Thus, Count One will be dismissed to the extent it is premised on a contractual relationship arising from operation of 26 U.S.C. § 501(c)(3).[7]
2. Count Three: Breach of Duty of Good Faith and Fair Dealing
In Count Three, Plaintiffs allege, among other things, that BJC/Barnes' actions with respect to the contracts described in Count One constitute a breach of their duties of good faith and fair dealing. Thus, the federal law portion of Count Three is necessarily dependent on Plaintiffs' ability to prevail on Count One. Because the Court has found that, as a matter of law, no contractual relationship based in federal law exists, the federal law portion of Count Three will be dismissed.
3. Count Four: Breach of Charitable Trust
In Count Four, Plaintiffs allege, among other things, that BJC/Barnes created and entered into a public charitable trust by accepting federal tax exemptions under 26 U.S.C. § 501(c)(3). Plaintiffs further allege that they are the intended beneficiaries. According to Plaintiffs, BJC/Barnes breached their charitable trust obligations by failing to take certain action and by engaging in certain prohibited activities.
Charitable trusts require language which demonstrates a specific intent to create the trust. Here, there is simply nothing in the language of § 501(c)(3) which might be read as a specific intent to create the alleged charitable trust. See Shriner v. ProMedica Health Sys., Inc., 2005 WL 139128, at *3 (N.D.Ohio Jan. 21, 2005) (finding no charitable trust). Moreover, as one court has already explained, "[a] review of general trust principles shows that the tax exemption granted under Section 501(c)(3) does not create a trust, express or implied, resulting or constructive." Washington, No. 5:04CV185(CAR), slip op. at 9. Even if a charitable trust existed, Plaintiffs would not be the proper parties to enforce such a trust. See State ex rel. Cent. Inst. for Deaf v. Burger, 949 S.W.2d 126, 127 (Mo.App.1997) (attorney general is proper party to bring action for failure to carry out charitable purpose); Burton v. Beaumont Hospital, 347 F.Supp.2d 486, 494 (E.D.Mich.2004) (attorney general is the proper party to enforce a charitable trust); Amato v. UPMC, No. 04-1025, slip op. at 6-8 (W.D.Pa. Nov. 23, 2004) (collecting authority in support of proposition that, even if a charitable trust exists, Plaintiffs, as private citizens, lack standing to enforce claim).[8] Because no trust exists, Plaintiffs *1053 cannot allege any facts demonstrating a breach of the terms of the alleged trust. Therefore, Count Four will be dismissed to the extent it is premised upon federal law.
4. Count Six: Violations of the Emergency Medical Treatment and Active Labor Act
In Count Six, Plaintiffs allege that BJC/Barnes violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, by engaging in certain prohibited conduct. According to the Amended Complaint, before BJC/Barnes would provide emergency medical screening or treatment to Plaintiffs, BJC/Barnes first analyzed their ability to pay for care and required them to sign form contracts agreeing to pay for their medical care. BJC/Barnes "would not provide emergency medical screening [or] treatment to Plaintiffs unless they were able to pay for such medical care or until they agreed to sign a form contract guaranteeing payment in full for medical care." Amend. Compl. at 29-30. Plaintiffs allege that, by conditioning screening and treatment on Plaintiffs' ability to pay and by refusing to provide screening or treatment unless certain financial guarantees were given, BJC/Barnes violated EMTALA. Plaintiffs state that these violations caused economic injury and other damages.[9]Id. at 30.
EMTALA requires a hospital to provide a patient with an appropriate medical screening and to stabilize a patient's condition or arrange for an appropriate transfer to another facility. 42 U.S.C. § 1395dd(a)-(b). An EMTALA claim encompasses the following elements: (1) defendant has both a Medicare provider agreement with the Secretary of Health and Human Services and an emergency room or emergency department; (2) plaintiff went to the defendant's emergency room or emergency department; (3) plaintiff requested examination or treatment; (4) plaintiff had an emergency medical condition; (5) defendant did not provide plaintiff with an appropriate medical screening examination; and (6) as a direct result of the conduct of defendant, plaintiff suffered personal harm. Hunt ex rel. Hunt v. Lincoln County Mem'l Hosp., 317 F.3d 891, 893 n. 4 (8th Cir.2003). An EMTALA claim is subject to a two-year statute of limitations. 42 U.S.C. § 1395dd(d)(2)(C).[10]
The Amended Complaint fails to state a claim for an EMTALA violation. As an initial matter, the claims by Plaintiffs Quinn and Kuneman are barred by the two-year statute of limitations. This lawsuit was initiated on June 22, 2004, more than eight years after Plaintiff Quinn was admitted to Barnes on January 16, 1996, and more than three years after Plaintiff Kuneman allegedly received medical tests at BJC/Barnes on June 8, 2001.[11] *1054 Plaintiff Eyster also fails to state a claim for any EMTALA violation. Plaintiff Eyster alleges that she went to the emergency room at Barnes with chest pains and, at the time of admission, told the intake clerk that she was a "self-pay." She next alleges that, "[d]uring her thirty-six hour stay" at the hospital, several tests were performed. Then, "[w]hen it was determined an additional stress test should be performed, Plaintiff Eyster told the physician she did not have insurance and asked how much the test would cost. The physician responded that if she did not have insurance, he did not think she needed the test." Amend. Compl. at 14-15. Plaintiff Eyster's own allegations make it clear that the action of which she complains took place, not as part of the screening and stabilization process, but after her admission to the hospital. "If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation [under EMTALA] ends." 42 C.F.R. 489.24(a)(1)(ii). By Plaintiff Eyster's own allegations, her alleged discriminatory treatment took place "[d]uring her thirty-six hour stay," after the EMTALA obligation had already ended. She does not allege that she was denied the screening or treatment required by EMTALA.
Finally, Plaintiffs' allegation that they were required to sign a form contract promising to pay for their medical treatment is not sufficient to establish a claim for an EMTALA violation. Requiring an individual to sign a standard intake form does not violate EMTALA, and hospitals may follow reasonable registration processes, including asking whether the individual is insured. See 42 C.F.R. § 489.24(d)(2)(iv)[12]; see also Amato, No. 04-1025, slip op. at 9 ("EMTALA does not forbid a hospital from inquiring into a patient's ability to pay for treatment, so long as its inquiry does not delay screening or treatment."). None of the Plaintiffs allege that their treatment was delayed or denied as a result of signing the form. Further, because the EMTALA does not guarantee a proper diagnosis, see Hunt, 317 F.3d at 894, the allegation that Plaintiff Eyster "later sought treatment at another facility," does not establish an EMTALA violation. In sum, the Amended Complaint contains no allegations that any medical screening or treatment was delayed or denied, or that any Plaintiff was treated differently than other similarly-situated patients during the screening and stabilization process. The Amended Complaint thus fails to establish an EMTALA claim, and Count Six will be dismissed.[13]
5. Count Seven: Unjust Enrichment/Constructive Trust
In Count Seven, Plaintiffs allege that, as a result of BJC/Barnes' breaches of contract "along with their wrongful, unfair, discriminatory, abusive, and noncharitable conduct," BJC/Barnes have been unjustly *1055 enriched at Plaintiffs' expense. Plaintiffs allege that they are entitled to the imposition of a constructive trust in the amount of BJC/Barnes' tax exemption savings, profits wrongfully obtained by charging Plaintiffs the undiscounted cost of medical care, and the difference between the amount charged to Plaintiffs and the amount charged to insured patients. To the extent this count is premised on federal law, it will be dismissed. The Court has already found that, as a matter of law, Plaintiffs have failed to demonstrate the existence of any contract under § 501(c)(3) or that they are third-party beneficiaries under such a contract. Moreover, an unjust enrichment claim rests upon the concept that a person who wrongfully obtained property will restore it to its rightful owner. Plaintiffs here would not be the rightful owners of money the defendants retained as a result of their federal tax-exempt status.
6. Counts Eight and Nine: Civil Conspiracy/Concert of Action and Aiding/Abetting
In Count Eight, Plaintiffs allege that the AHA, through certain internal memos, "conspired and acted in concert with BJC" to charge Plaintiffs certain costs for care and to aggressively collect those costs. Plaintiffs also allege that the AHA conspired with BJC to wrongfully retain its tax exempt status and breach BJC's "contracts" with the federal and Missouri governments. Further, Plaintiffs allege that the AHA conspired with BJC to violate the Missouri Merchandising Practices Act ("MMPA") and to breach BJC's duty of good faith and fair dealing. In Count Nine, Plaintiffs allege that the AHA, through internal memos and other advisory assistance, aided and abetted BJC in charging Plaintiffs certain medical care costs and collecting those costs from Plaintiffs. Plaintiffs further allege that the AHA aided and abetted BJC's breach of its "contracts" with the Missouri and federal governments by taking certain actions, and that, through these actions, the AHA aided and abetted BJC's violations of the MMPA and BJC's breach of its duty of good faith and fair dealing.
Both of these Counts are clearly based, on the theory that there exists a "contract" between BJC/Barnes and the federal government. Plaintiffs' allegation is that AHA conspired with BJC/Barnes and/or aided or abetted BJC/Barnes to breach said contract. The Court, however, has already found that Plaintiffs' theory regarding any alleged contract pursuant to 26 U.S.C. § 501(c)(3) to be without merit. Therefore, the Court will dismiss Counts Eight and Nine to the extent they are premised on federal law.[14]
B. State Law Claims
Counts One, Two,[15] Three,[16] Four, *1056 Five,[17] Seven, Eight, and Nine contain allegations regarding state law claims over which the Court has no original jurisdiction. Pursuant to 28 U.S.C. § 1367, "[t]he district court may decline to exercise supplemental jurisdiction ... if [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "In the usual case in which all federal-law claims are eliminated before trial, the balance of the factors to be considered under the pendent jurisdiction doctrine  judicial economy, convenience, fairness, and comity  will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Federal district courts should exercise judicial restraint and avoid state law issues wherever possible because state law claims are more properly heard by state courts. Cameron v. Mid-Continent Livestock Supp., Inc., 211 F.Supp.2d 1120, 1127 (E.D.Mo.2002) (quoting Condor Corp. v. City of St. Paul, 912 F.2d 215, 220 (8th Cir.1990)). See also United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (in the absence of a viable federal claim, the district court should decline to exercise supplemental jurisdiction over the state law claims).
Here, the Court has determined that all of the federal claims should be dismissed. It is preferable for the Missouri courts to interpret the remaining issues of state law. In accordance with § 1367 and Carnegie-Mellon University, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims. The state law claims will be dismissed for lack of jurisdiction.[18]
Accordingly,
IT IS HEREBY ORDERED that Defendant AHA's Motion to Dismiss [doc. # 33] and Defendants BJC/Barnes' Motion to Dismiss [doc. # 37] are GRANTED, in part, and DENIED, in part. Those portions of Counts One, Three, Four, Seven, Eight, Nine, and Ten which are premised on federal law are dismissed, with prejudice, for failure to state a claim. Those portions of Counts One, Three, Four, Seven, Eight, Nine, and Ten which are premised on state law are dismissed, without prejudice to be refiled in state court, for lack of jurisdiction. Count Six is dismissed, with prejudice, for failure to state a claim. Counts Two and Five are dismissed, without prejudice to be refiled in state court, for lack of jurisdiction.
IT IS FURTHER ORDERED that Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment with Respect to Plaintiff Quinn [doc. # 39] and Defendants' Motion for Partial Summary *1057 Judgment with Respect to Plaintiff Kuneman [doc. # 42] are DENIED as moot.
An appropriate order of dismissal will accompany this Order.

ORDER OF DISMISSAL
In accordance with the Memorandum and Order of this Court filed on this date and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that all claims against Defendants BJC Health Systems, Barnes-Jewish Hospital, and American Hospital Association shall be dismissed as follows: Those portions of Counts One, Three, Four, Seven, Eight, Nine, and Ten which are premised on federal law are DISMISSED, with prejudice, for failure to state a claim. Those portions of Counts One, Three, Four, Seven, Eight, Nine, and Ten which are premised on state law are DISMISSED, without prejudice to be refiled in state court, for lack of jurisdiction. Count Six is DISMISSED, with prejudice, for failure to state a claim. Counts Two and Five are DISMISSED, without prejudice to be refiled in state court, for lack of jurisdiction.
NOTES
[1] On October 19, 2004, the Motion for centralization of the 28 nationwide actions, including the instant case, pursuant to 28 U.S.C. § 1407, was denied by the Judicial Panel on Multidistrict Litigation. See MDL Panel Order [doc. # 58].
[2] On November 9, 2004, John Doe Defendants 1-10 were dismissed without prejudice.
[3] Although this Amended Complaint is styled "Amended Class Action Complaint," Am. Compl. [doc. # 13], this case has not been certified as a class action pursuant to Fed.R.Civ.P. 23.
[4] Ordinarily, the Court refrains from using the term "and/or" because the Court finds it to be ambiguous. However, because Plaintiffs make their allegation using "and/or," the Court will repeat it here.
[5] 26 U.S.C. § 501(a) provides that "[a]n organization described in subsection (c) ... shall be exempt from taxation under this subtitle." Section 501(c) lists exempt organizations:

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes ..., no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation..., and which does not participate in, or intervene in ..., any political campaign on behalf of ... any candidate for public office.
26 U.S.C. § 501(c)(3).
[6] Plaintiffs cite to "Chapter 355 RSMO," without specifying any section(s) or clause(s) of the Missouri statute upon which the alleged contract between BJC/Barnes and Missouri government is based.
[7] In addition to the lack of contractual relationship problem, Plaintiffs' claim also fails because they have not pled facts to indicate that they are intended third-party beneficiaries here. Parties that benefit from government contracts are presumed to be incidental beneficiaries and are unable to enforce the contract, absent some clear contrary intent. See Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1211 (9th Cir.1999). In fact, there is evidence that Congress did not intend taxpayers to be third-party beneficiaries with respect to the Code provisions. See, e.g., 26 U.S.C. § 7428 (authorizing IRS to pursue civil actions against tax exempt organizations that contravene their tax exempt status); 26 U.S.C. § 7401 (private suits based on Code violations may not be filed by third parties).
[8] As BJC/Barnes points out, Plaintiffs have not alleged facts which might be read as permitting them to fall within the narrow exception to the general rule that private parties cannot enforce charitable trusts.
[9] Although the Amended Complaint makes these broad allegations, none of the three Plaintiffs alleges any facts indicating that they were denied treatment or that their treatment was delayed for failing to sign such a form.
[10] 42 U.S.C. § 1395dd(d)(2)(C) states as follows: "No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought."
[11] Plaintiffs argue that the EMTALA accrual period begins when they discovered or should have discovered their injuries. The Court need not decide this issue because, even if their claims were not time-barred, Plaintiffs Quinn and Kuneman nonetheless fail to state an EMTALA claim. Plaintiff Quinn alleges that he was admitted to Barnes and underwent surgery. Plaintiff Kuneman had some medical tests performed and received treatment at BJC/Barnes. Neither Plaintiff alleges that his care was delayed or that he received inappropriate emergency treatment in violation of EMTALA.
[12] 42 C.F.R. § 489.24(d)(2)(iv) provides, in relevant part:

Hospitals may follow reasonable registration processes for individuals for whom examination or treatment is required by this section, including asking whether an individual is insured and, if so, what the insurance is, as long as that inquiry does not delay screening or treatment.....
[13] Throughout the Amended Complaint, Plaintiffs allege that insured and uninsured patients are charged different rates for the same medical care. BJC admits that there is a price discrepancy for medical services charged to insured and uninsured patients. There is no dispute that refusing care to patients because of their non-insured status (i.e., "patient dumping") is illegal under EMTALA. See Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1136-37 (8th Cir.1996). However, charging different rates based on one's status as insured or uninsured (i.e., giving "volume discounts" to certain insured patients) is not a prohibited activity under EMTALA.
[14] In its briefing, AHA makes several First Amendment arguments. These arguments need not be addressed because the Court has determined that Plaintiffs' claims will be dismissed.
[15] In Count Two, Plaintiffs allege that they entered into express form contracts with BJC/Barnes. According to Plaintiffs, imputed in these contracts is an express or implied contractual obligation by BJC/Barnes to charge Plaintiffs no more than a fair and reasonable charge for medical care. Plaintiffs further allege that, by accepting and admitting Plaintiffs into its hospitals, BJC/Barnes undertook an express or implied contractual obligation to charge them no more than a fair and reasonable charge for medical care. Plaintiffs state that BJC/Barnes breached this contractual obligation by charging them the "highest and full undiscounted cost for medical care."
[16] In Count Three, Plaintiffs allege that BJC/Barnes' actions with respect to the contracts described in Count One, or alternatively, the contracts described in Count Two, constitute a breach of their duties of good faith and fair dealing.
[17] In Count Five, Plaintiffs allege that BJC/Barnes violated the MMPA, Mo.Rev.Stat. § 407.010  407.943, by engaging in certain conduct constituting deceptive and illegal practices which has caused substantial economic injury to Plaintiffs. The purpose of the MMPA is to preserve fundamental honesty, fair play, and right dealings in public transactions. State ex rel. Nixon v. Beer Nuts, Ltd., 29 S.W.3d 828, 837 (Mo.App.2000). The MMPA's failure to define deceptive practices leaves to the state court in each particular instance the determination as to whether fair dealing has been violated. Webster v. Areaco Inv. Co., 756 S.W.2d 633, 635 (Mo.App.1998).
[18] The Amended Complaint also contains Count Ten, which is actually not an independent basis for relief, but is instead a request for injunctive relief. In Count Ten, Plaintiffs state that, as a result of BJC/Barnes' charging and collection practices and AHA's participation in those practices, they have suffered and will continue to suffer severe and irreparable harm. They request an injunction ordering BJC, Barnes, and AHA to refrain from certain actions and a prospective order requiring BJC/Barnes to take certain actions. Count Ten will be dismissed to the extent it is premised upon the federal law claims.