El Juez Asociado Señor Martínez Torres
emitió la opinión del Tribunal.
[La cláusula constitucional que pro-híbe el menoscabo de obligaciones contractuales es un precepto] clásico en el derecho del estado liberal, re-afirmando y consolidando la validez de los compromisos contractuales.
—4 Diario de Sesiones de la Con-vención Constituyente de Puerto Rico 2567 (1961)
En esta ocasión nos corresponde evaluar la validez cons-titucional de la Ley Núm. 160-2013, conocida como Ley de Retiro para Maestros del Estado Libre Asociado de Puerto Rico, que reformó al Sistema de Retiro de Maestros de Puerto Rico (SRM).
Somos conscientes del impacto que tiene la decisión que hoy tomamos. Los maestros son quienes moldean el cono-cimiento de los integrantes de nuestra sociedad. Son pieza fundamental del sistema educativo. Ante esa realidad, te-nemos el deber de examinar cuidadosamente el asunto planteado a la luz del derecho vigente tomando en cuenta no solo los intereses de la clase magisterial, sino también la situación fiscal precaria que enfrenta el Gobierno de Puerto Rico.
Por los fundamentos que exponemos a continuación, concluimos que para propósitos de la cláusula constitucio-nal que prohíbe el menoscabo de obligaciones contractua-les —Art. II, Sec. 7 de la Constitución de Puerto Rico, LPRA, Tomo 1— la Ley Núm. 160-2013 es irrazonable y *858 por consiguiente inconstitucional, toda parte del estatuto que altera el derecho contractual que tienen los peticiona-rios demandantes sobre su pensión de retiro, conforme a la Ley Núm. 91-2004, 18 LPRA see. 391 et seq.
Ahora bien, resolvemos que son constitucionales la See. 2 de la Ley Núm. 160-2013, en cuanto derogó las leyes especiales que concedían unos beneficios adicionales que no forman parte de la pensión, y el Art. 4.9 de esa misma legislación, que eliminó ciertos beneficios a los miembros del SRM que se retiren a partir del 1 de agosto de 2014.
Por último, determinamos que los participantes que en-traron a cotizar al SRM con posterioridad a la aprobación de la Ley Núm. 160-2013, solo tienen derecho a la pensión que establece esa legislación. Ese grupo no sufrió un me-noscabo de su derecho contractual que active la protección que confiere el Art. II, Sec. 7 de la Constitución de Puerto Rico, supra. Por lo tanto, esa parte de la ley no viola la Constitución.
I
En este caso contamos con el beneficio de un informe suministrado por el Comisionado Especial, Hon. Ángel Pa-gán Ocasio, Juez Superior, quien fue nombrado por este Tribunal para hacer unas determinaciones de hechos basa-das en la prueba presentada por las partes. Luego de eva-luar ese informe, acogemos las determinaciones de hechos del Comisionado Especial. Para facilitar la comprensión de los acontecimientos que dieron origen a la controversia que nos ocupa, resumimos los hechos pertinentes.
El 30 de junio de 2012, el Sr. Glenn D. Brown y la Sra. Katherine A. Warren (ambos de la compañía de estudios actuariales Milliman) prepararon un Informe de Valoriza-ción Actuarial para el SRM. La compañía Milliman ha ren-dido informes de valoración actuarial para el SRM desde el 2007.
*859 Según ese informe actuarial, el SRM contaba con $2,099,563,000 en activos y $12,350,836,000 en pasivos, y el valor de los beneficios sumaba a $15,416,000,000. Esos cálculos producían un déficit actuarial de $10,251,273,000 para el 30 de junio de 2012. Abase de ello, las contribucio-nes periódicas requeridas para cubrir los desembolsos nor-males del plan y amortizar el déficit de las obligaciones actuariales se estimaron en $736.6 millones, fijados en un período de repago de veinticinco años y una tasa de interés de 5.95%. Por su parte, el flujo de dinero en efectivo pre-senta un déficit de $334.5 millones para el 30 de junio de 2013.
El informe actuarial también demostró que para el 2020 se agotarán todos los activos del SRM y no habrá fondos para pagar las pensiones si no se toman las medidas co-rrectivas pertinentes. Ausentes los cambios necesarios, el Fondo General del Tesoro de Puerto Rico tendría que asu-mir la deficiencia del SRM. Se proyecta que para el año fiscal 2021-2022 esa deficiencia sería de $317,881,000, para el año fiscal 2022-2023 sería de $340,675,000, y para el año fiscal 2023-2024 sería de $363,168,000. Esas canti-dades son adicionales a las aportaciones patronales para esos años y presumen un aumento en nómina de 3.5% anual desde el año fiscal 2013-2014.
Más aún, el informe actuarial demuestra que el por-ciento de miembros inactivos ha aumentado, por lo que el SRM se ha tornado más maduro. Eso significa que el por-ciento de miembros inactivos ha aumentado en compara-ción con los miembros activos. Es decir, para 1999, la can-tidad de miembros activos en el sistema ascendía a 48,122, mientras que los miembros inactivos sumaban 22,969 (32%). Sin embargo, en el 2012 la cantidad de miembros activos se redujo a 42,707 y los miembros inactivos aumen-taron a 37,243 (47%).
Cuando los activos son iguales o superiores a los pasi-vos, el sistema de retiro se considera financieramente sus- *860 tentable y viable. Por el contrario, cuando la cantidad de activos es menor a la de los pasivos, como demostró el in-forme actuarial en este caso, el plan se considera no sus-tentable y no viable. Se estimó que, si el SRM sigue la misma tendencia, los activos seguirán disminuyendo hasta que en el 2020 se agoten por completo y no haya fondos para pagar las pensiones. Abase de los datos anteriores fue que se decidió hacer un cambio al SRM y convertirlo en un sistema de aportación definida.
El 11 de octubre de 2013 se celebró una reunión entre el Gobernador de Puerto Rico y el Frente Amplio en Defensa del Retiro para Maestros (FADSRM), cuyos componentes incluyen a las partes demandantes en este caso —la Aso-ciación de Maestros de Puerto Rico (Asociación) y Educa-dores por la Democracia, Unidad, Cambio, Militancia y Or-ganización Sindical, Inc. (EDUCAMOS), entidad compuesta por empleados y exempleados docentes del De-partamento de Educación de Puerto Rico que cotizan o son pensionados del SRM — . En noviembre de 2013 se celebra-ron tres reuniones adicionales, durante las cuales el FADSRM entregó al Gobernador diez propuestas para re-formar el SRM, y el Gobernador entregó las suyas a los líderes magisteriales. Las propuestas que el FADSRM en-tregó al Gobernador son las siguientes:
(1) Reducir en un 10% los gastos administrativos del SRM. Se estima que esta medida producirá $2.5 millones anualmente.
(2) Reducir en un 10% los gastos administrativos en el Departamento de Educación, a excepción de gastos de nó-mina, pero incluyendo contratos innecesarios. Se estima que esta medida producirá $52 millones anualmente.
(3) Que el Departamento de Educación pague de inme-diato los 24 millones de dólares que le adeuda al SRM y continúe haciendo la aportación correspondiente conforme la Ley Núm. 114-2011.
(4) Eliminar las “pensiones privilegiadas”.
*861 (5) Nombrar las plazas que se requieren en las escuelas para que más maestros aporten al SRM.
(6) Aumentar en 1% la contribución a las empresas fo-ráneas y asignarlos al SRM.
(7) Asignar al SRM los fondos no reclamados de la Lo-tería Electrónica.
(8) Imponer un cargo adicional al consumo de cigarri-llos, bebidas alcohólicas y comidas rápidas.
(9) Imponer un cargo de hasta un 10% a los premios mayores de $1,000 obtenidos de juegos al azar.
(10) Imponer un tope máximo de $3,500 mensuales a las pensiones. Ese tope deberá revisarse cada dos años.
El 18 de diciembre de 2013 el Gobernador convocó una sesión extraordinaria para considerar nueva legislación. El 19 de diciembre de 2013, a la 1:47 a. m., se envió a la Asamblea Legislativa un proyecto de ley, compuesto de 93 páginas, que se convirtió en el P. de la C. 1589. A su vez, se envió lo que pasó a ser el P. de la C. 1594, cuyo propósito era proveer un aumento de $25 mensuales al sueldo básico de los maestros. Ese mismo día se celebró una sesión legislativa. En ese momento, el informe actuarial de Milli-man de 2012 era el más reciente con el que se contaba.
El 20 de diciembre de 2013 se celebró una vista pública para discutir el P. de la C. 1589. Al día siguiente, el 21 de diciembre de 2013, se aprobó ese proyecto en la Cámara de Representantes. El Senado, a su vez, aprobó el proyecto el 23 de diciembre de 2013. El 24 de diciembre de 2013, el Gobernador firmó el proyecto que pasó a ser la Ley Núm. 160-2013 y que tuvo vigencia inmediata. Firmó también el P. de la C. 1594, convirtiéndolo en la Ley Núm. 161-2013. El trámite legislativo de ambas leyes duró seis días.
La Ley Núm. 160-2013, introdujo las modificaciones si-guientes al SRM:
(1) Aumenta la edad mínima de retiro para quienes se jubilen a partir del 1 de agosto de 2014. Se aumentó de 47 años de edad, con 25 años de servicio cotizados, a 55 años *862 de edad, con 30 años de servicio cotizados o, en su alterna-tiva, a 60 años de edad, con 5 años de servicios cotizados. Véase Art. 3.9 de la Ley Núm. 160-2013.
(2) Aumenta a 62 años la edad mínima de retiro para maestros de nuevo reclutamiento. Véase Art. 3.9 de la Ley Núm. 160-2013.
(3) Aumenta la aportación individual de los maestros de un 9% del salario bruto a un 10% en el 2014, 13.12% en el año fiscal 2017-2018 y 14.02% en el año fiscal 2020-2021. Véanse Arts. 5.5 y 4.3 de la Ley Núm. 160-2013.
(4) Elimina el bono de verano ($100 al año) a todos los participantes. Véase See. 2 de la Ley Núm. 160-2013.
(5) Elimina la aportación al plan de salud (hasta $100 al mes), el bono para medicamentos ($100 al año) y el agui-naldo de Navidad ($600 al año) para quienes se jubilen a partir del 1 de agosto de 2014. Véase Art. 4.9 de la Ley Núm. 160-2013.
(6) Reduce el aguinaldo de Navidad de $600 a $200 a quienes se hayan jubilado antes del 1 de agosto de 2014. Véase Art. 4.9 de la Ley Núm. 160-2013.
(7) Impone un tope de 33% del salario mensual prome-diado a cinco años a las pensiones por incapacidad para los participantes activos previo al 1 de agosto de 2014. Véase Art. 4.6 de la Ley Núm. 160-2013.
(8) Establece una pensión mínima de $1,625 para aque-llos maestros activos al 31 de julio de 2014 que no se pue-dan retirar a esa fecha con una pensión cuyo beneficio sea igual o mayor al 65% del salario promedio según definido por ley, y luego soliciten el retiro al cumplir 30 años de servicio y 55 años de edad. Véase Art. 3.11 de la Ley Núm. 160-2013.
(9) Excluye a los maestros actualmente activos que se jubilen con menos de 30 años de servicio a partir del 1 de agosto de 2014 del derecho a una pensión mínima. Tam-poco tendrán derecho a ella quienes, al amparo de la Ley Núm. 91-2004 hubiesen sido elegibles para retirarse con 30 *863 años de servicio al 30 de junio de 2016 y no opten por retirarse antes de agosto de 2014. Véase Art. 3.11 de la Ley Núm. 160-2013.
(10) Impide a los participantes con cinco años o más de servicio y $10,000 o más de aportaciones al SRM solicitar el rembolso de sus aportaciones, a partir del 1 de agosto de 2014. Véase Art. 5.10 de la Ley Núm. 160-2013.
(11) Se crea una ventana de retiro incentivado para los participantes que cumplan 30 años de servicio entre el 1 de agosto de 2014 al 30 de junio de 2016. El participante que se acoja a esa ventana tendrá derecho a una pensión del 70% de su salario, siempre que se acogiese al 31 de marzo de 2014 y se retire al 31 de julio de 2014. Ahora bien, si la persona que se acoge no tiene 55 años de edad, está obli-gada a pagar su aportación individual correspondiente hasta que cumpla esa edad. Véase Art. 4.4(a) de la Ley Núm. 160-2013.
La tabla siguiente refleja otros cambios que introdujo la Ley Núm. 160-2013 con respecto a la Ley Núm. 91-2004:
Ley Núm. 1-2004 Ley Núm. 160-2013
Si completó 30 o más años de servicio y cumplió 50 años de edad tiene derecho a una pen-sión anual vitalicia de 75% del promedio de los salarios más altos durante 3 años. Si completó más de 30 años de servicio y cumplió al menos 50 años de edad tiene derecho a la pensión acumulada hasta el 31 de julio de 2014 equivalente al 75% del promedio de los salarios más altos durante 3 años hasta el 31 de julio de 2014, sumada a la pensión por el periodo traba-jado a partir del 1 de agosto de 2014.
Si tiene más de 25 años de ser-vicio pero menos de 30 años y cumplió los 50 años de edad tiene derecho a una pensión anual vitalicia igual al 1.8% del promedio de los salarios más altos durante 3 años multiplica-dos por el número de años de servicios prestados._ Si tiene más de 25 años de ser-vicio pero menos de 30 años y cumplió los 50 años de edad tiene derecho a la pensión acu-mulada hasta el 31 de julio de 2014 igual a lo establecido en la Ley Núm. 91-2004, sumada a la pensión por el periodo trabajado a partir del 1 de agosto de 2014.
*864 Si completó 30 años o más de servicio y no ha cumplido los 50 años de edad tiene derecho a la pensión anual vitalicia de 65% del promedio de los salarios más altos durante 3 años. Si completó 30 años o más de servicio y no ha cumplido los 50 años de edad tiene derecho a la pensión acumulada hasta el 31 de julio de 2014 igual a lo esta-blecido en la Ley Núm. 91-2004, sumada a la pensión por el pe-riodo trabajado a partir del 1 de agosto de 2014.
Si cumplió 47 años de edad pero menos de 50 y tiene 25 pero me-nos de 30 años de servicio tiene derecho al 95% de la renta anual vitalicia que le correspon-día de haber ocurrido el retiro del participante a la edad de 50 años. Si cumplió 47 años de edad pero menos de 50 y tiene 25 pero me-nos de 30 años de servicio tiene derecho a la pensión acumulada hasta el 31 de julio de 2014 igual a lo establecido en la Ley Núm. 91-2004, sumada a la pen-sión por el periodo trabajado a partir del 1 de agosto de 2014.
Si se renuncia antes de cumplir 60 años de edad y hubiere ter-minado por lo menos de 10 a 25 años de servicios acreditables tendrá derecho a una renta anual vitalicia por retiro dife-rido que comenzará a recibir cuando haya cumplido los 60 años de edad. Si se renuncia antes de cumplir 60 años de edad y hubiere ter-minado por lo menos de 10 a 25 años de servicios acreditables tendrá derecho a la pensión acu-mulada hasta el 31 de julio de 2014 igual a lo establecido en la Ley Núm. 91-2004, sumada a la pensión por el periodo trabajado a partir del 1 de agosto de 2014.
El 8 de enero de 2014, la Asociación y varios maestros cobijados por la Ley Núm. 91-2004 presentaron una solici-tud de injunction preliminar y sentencia declaratoria ante el Tribunal de Primera Instancia, Sala de San Juan, Caso Núm. KPE2014-0017 (907), para declarar inconstitucional y paralizar de inmediato los efectos de la Ley Núm. 160-2013. Posteriormente, la Organización de Directores y Ad-ministradores Escolares de Puerto Rico (ODAE), Educado-res Puertorriqueños en Acción, Inc. (EPA) y varios miembros afectados de esas organizaciones presentaron unas solicitudes de intervención.
Pendiente el trámite ante el Tribunal de Primera Ins-tancia, la Asociación acudió ante nos y presentó una solici- *865 tud de certificación intrajurisdiccional. Mediante una Re-solución de 14 de enero de 2014, acogimos la solicitud de certificación, paralizamos los efectos de la Ley Núm. 160-2013, y nombramos al Juez Superior Hon. Angel R. Pagán Ocasio como comisionado especial para que emitiera las determinaciones de hechos correspondientes.
Por otra parte, el 21 de enero de 2014, EDUCAMOS y varios maestros cobijados por la Ley Núm. 91-2004 presen-taron una demanda de la misma naturaleza ante el foro primario, Caso Núm. KPE2014-0059(907). Al día si-guiente, presentaron una petición de certificación y una moción de consolidación ante este Foro. El 27 de enero de 2014 consolidamos.
En síntesis, los peticionarios demandantes aducen que la Ley Núm. 160-2013, menoscaba inconstitucionalmente la obligación contractual que asumió el Estado en cuanto al SRM. Además, aducen que esa ley viola el debido pro-ceso de ley en su vertiente sustantiva, la igual protección de las leyes y la doctrina de delegación de poderes. Asi-mismo, alegan que las acciones del gobierno son constitu-tivas de expropiación forzosa, enriquecimiento injusto y violación de derechos fundamentales.
A solicitud de las partes demandadas recurridas, tomamos conocimiento judicial de los informes emitidos por las casas acreditadoras Standard & Poor’s, Fitch y Moody’s en los que se degradó el crédito de las obligaciones generales del Estado Libre Asociado de Puerto Rico, entre otros. Además, a solicitud de las partes demandantes, tomamos co-nocimiento judicial del Informe del Comité de Diálogo y Negociación compuesto por altos funcionarios de la Rama Ejecutiva, miembros del magisterio y otros profesionales.(1) *866 En ese informe se analizaron varias medidas de recaudos que viabilizarían una pensión equivalente al 75% del sueldo promedio del maestro. Algunas de las medidas con-sideradas fueron las siguientes:
(1) impuesto de menos de uno por ciento (.75%) a las corporaciones foráneas a partir del 2017;
(2) impuesto de 10% a los premios devengados en las máquinas de entretenimiento de adultos;
(3) incluir a los maestros de escuelas privadas como participantes del SRM;
(4) reducción de los gastos de operación del SRM de un 10% a un 20%;
(5) impuesto adicional a cigarrillos y bebidas alcohóli-cas;
(6) establecer una moratoria en los préstamos del SRM;
(7) crear un incentivo a maestros activos que están por retirarse para que permanezcan trabajando por dos o tres años más.
Luego de varios trámites procesales, el 29 de enero de 2014 se celebró una vista evidenciarla en la que las partes presentaron sus estipulaciones de hechos. El 7 de febrero de 2014 el Comisionado Especial sometió un informe con sus determinaciones de hechos. Las partes tuvieron la oportunidad de presentar sus comentarios y objeciones so-bre el informe del Comisionado Especial, así como para presentar sus alegatos respectivos.
El 26 de marzo de 2014 celebramos una vista oral en la que las partes presentaron sus posturas. Como se puede apreciar, aunque este caso ha tenido un trámite expedito, las partes han tenido una oportunidad amplia de litigar su causa.
II
En primer lugar, por ser un asunto de umbral que pode-mos atender por iniciativa propia, atendemos el asunto de *867 nuestra jurisdicción para resolver este recurso de certificación. S.L.G. Solá-Moreno v. Bengoa Becerra, 182 DPR 675, 682 (2011).
La Ley Núm. 18-2013, enmendó el Art. 3.002 de la Ley Núm. 201-2003, conocida como la Ley de la Judicatura de 2003, 4 LPRA sec. 24s, con el propósito de limitar las ins-tancias en que este Tribunal podía expedir autos de certificación intrajurisdiccional. En particular, la Ley Núm. 18-2013 exigía que para poder hacer efectiva nuestra jurisdicción en casos de certificación provenientes del Tribunal de Primera Instancia, “ambas partes” de un pleito tenían que dar su anuencia para que el auto pudiera expedirse. Esa ley también limitó la jurisdicción de este Foro para emitir autos de certiorari con relación a decisio-nes interlocutorias del Tribunal de Apelaciones. En Alvarado Pacheco y otros v. ELA, 188 DPR 594 (2013), resolvimos en una resolución de este Foro que los Arts. 1 y 2 de la Ley Núm. 18-2013 eran inconstitucionales, en la medida en que alteran los incisos (d) y (e) del texto original del Art. 3.002 de la Ley de la Judicatura de 2003, 4 LPRA sec. 24s, y la Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V.
En Alvarado Pacheco y otros v. ELA, supra, emitimos nuestro dictamen en una resolución porque al examinar la petición de certificación en sus méritos, declinamos emitir el auto. Por su parte, en Brau, Linares v. ELA et als., 189 DPR 1068 (2013), emitimos un auto de certificación mediante resolución para atender en primera instancia la controversia allí planteada y citamos con aprobación a Alvarado Pacheco y otros v. ELA, supra. Sin embargo, este caso nos permite pautar mediante una opinión lo resuelto en Alvarado Pacheco y otros v. ELA, supra. Acogemos todos los fundamentos esbozados en la resolución que emitimos en ese caso y reafirmamos que los Arts. 1 y 2 de la Ley Núm. 18-2013 son inconstitucionales, en la medida en que alteran los incisos (d) y (e) del texto original del Art. 3.002 de la Ley de la Judicatura de 2003 y la Regla 52.2(d) de *868 Procedimiento Civil, supra. Por consiguiente, contamos con jurisdicción para atender este caso.
III
La Constitución de Puerto Rico dispone que “[n]o se aprobarán leyes que menoscaben las obligaciones contractuales”. Art. II, Sec. 7, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 296. Lo mismo dispone la Constitución de Estados Unidos en su Art. 1, Sec. 10, Const. EE. UU., LPRA, Tomo 1. Esa garantía limita la intervención del gobierno con obligaciones contractuales entre partes privadas y aquellas contraídas por el Estado. Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 80 (2010), certiorari denegado, Castro v. Puerto Rico, 131 S.Ct. 152 (Mem) (2010). Véanse, además: Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 US 400 (1983); U.S. Trust Co. of New York v. New Jersey, 431 US 1 (1977). Su propósito es “asegurar la estabilidad de las relaciones contractuales”. Trinidad Hernández et al. v. ELA et al., 188 DPR 828, 834 (2013).
Sin embargo, esa protección no es absoluta. Ello se debe a que esa garantía constitucional “debe ser armonizada con el poder de reglamentación del Estado en beneficio del interés público”. Trinidad Hernández et al. v. ELA et al., supra, pág. 834. Véanse, además: U.S. Trust Co. of New York v. New Jersey, supra, pág. 21; Warner Lambert Co. v. Tribunal Superior, 101 DPR 378, 394 (1973). Por eso, en reiteradas ocasiones hemos expresado “que no todo menoscabo [de una obligación] contractual es inconstitucional”. Trinidad Hernández et al. v. ELA et al., supra; Bayrón Toro v. Serra, 119 DPR 605, 619 (1987). Véase, además, U.S. Trust Co. of New York v. New Jersey, supra, pág. 16. Ahora bien, la jurisprudencia ha dejado claro que la cláusula que prohíbe el menoscabo de obligaciones contractuales es una limitación sustantiva al ámbito de acción del Estado. Allied Structural Steel Co. v. Spannaus, 438 US 234, 242 *869 (1978); P.M. Secunda, Constitutional Contracts Clause Challenges in Public Pension Litigation, 28 Hofstra Lab. & Emp. L.J. 263, 287 (2011).
El análisis al amparo de esta cláusula es distinto dependiendo de si se modifica un contrato en el que el Estado es parte, o uno entre partes privadas. Domínguez Castro et al. v. E.L.A. I, supra, pág. 80. En materia de contratos privados, el primer paso consiste en determinar la existencia de una relación contractual y si su modificación representa un menoscabo sustancial o severo. Trinidad Hernández et al. v. ELA et al., supra, pág. 834; Domínguez Castro et al v. E.L.A. I, supra, pág. 80; Warner Lambert Co. v. Tribunal Superior, supra, pág. 395. Si se determina que existe un menoscabo severo, es necesario evaluar “si la interferencia gubernamental responde a un interés legítimo y si está racionalmente relacionada con la consecución de dicho objetivo”. Trinidad Hernández et al. v. ELA et al., supra, págs. 834-835. Véanse, además: Domínguez Castro et al. v. E.L.A. I, supra, pág. 81; Warner Lambert Co. v. Tribunal Superior, supra. Se trata de un escrutinio de razonabilidad en el que se toma en cuenta cuán sustancial es el interés público promovido y la extensión del menoscabo contractual. Domínguez Castro et al. v. E.L.A. I, supra, pág. 81; Home Bldg. & Loan Ass’n v. Blaisdell, 290 US 398 (1934).
Por otra parte, cuando se menoscaba una obligación del Estado, se aplica un escrutinio más cuidadoso en vista de que el Estado, por ser parte en el contrato, podría actuar para beneficio propio. Trinidad Hernández et al. v. ELA et al., supra, pág. 835; Domínguez Castro et al. v. E.L.A. I, supra, pág. 81; Bayrón Toro v. Serra, supra, pág. 620; Warner Lambert Co. v. Tribunal Superior, supra. Por eso, el menoscabo contractual, “además de ser razonable, debe ser necesari[o] para adelantar un propósito gubernamental importante”. Trinidad Hernández et al. v. ELA et al., supra, pág. 835. Véanse, además, Bayrón Toro v. Serra, su *870 pra, pág. 619; U.S. Trust Co. of New York v. New Jersey, supra, pág. 29.
Hemos indicado que al evaluar la necesidad y razonabilidad de una ley para efectos de la cláusula que prohíbe el menoscabo de obligaciones contractuales, procede conferir alguna deferencia al criterio de la Asamblea Legislativa. Trinidad Hernández et al. v. ELA et al., supra, pág. 835; Domínguez Castro et al. v. E.L.A. I, supra, pág. 84. En esa tarea, no nos corresponde realizar una determinación “de novo sobre la existencia de otras alternativas para la solución del problema”. Domínguez Castro et al. v. E.L.A. I, supra, pág. 89.
Conviene destacar que según la jurisprudencia del Tribunal Supremo de la Nación, a mayor severidad del me-noscabo, mayor rigor debe tener el foro judicial en el análisis de la legislación impugnada. Allied Structural Steel Co. v. Spannaus, supra, pág. 245.
En Bayrón Toro v. Serra, supra, págs. 607-608, expresamos que “un participante en un plan de retiro tiene un interés propietario de naturaleza contractual protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales”.(2) En ese caso, el interés de salvaguardar el derecho de los participantes del plan de retiro colisionaba con el interés de permitir al Estado adoptar cambios para promover la estabilidad y solvencia del sistema. íd., pág. 618. Entendimos entonces que ambos intereses debían ser armonizados y, por consiguiente, “que el Estado puede, antes de que un empleado se jubile, enmendar los términos del sistema de retiro siempre y cuando las enmiendas sean razonables y adelanten su solvencia actuarial”. Trinidad Hernández et al. v. ELA et al., supra, *871 pág. 836, haciendo referencia a Bayrón Toro v. Serra, supra, pág. 618.
Por su parte, en Trinidad Hernández et al. v. ELA et al., supra, reiteramos lo resuelto en Bayrón Toro v. Serra, supra, en el contexto de la Ley Núm. 3-2013 que reformó el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades. Es decir, insistimos en ese caso que una reforma a un sistema de retiro gubernamental será constitucional si es razonable y necesaria para adelantar su solvencia actuarial, y no existen medidas menos onerosas para lograr ese fin. Trinidad Hernández et al. v. ELA et al., supra.
Por último, en Trinidad Hernández et al. v. ELA et al., supra, pág. 838, reconocimos que la parte demandante es quien tiene el peso de probar que la medida impugnada es irrazonable e innecesaria. Véase, además, United Auto., Aerospace, Agr. Implement Workers of America v. Fortuño, 633 F.3d 37, 45 (1er Cir. 2011).
IV
Las partes estipularon que los maestros demandantes tienen un contrato válido con el Gobierno de Puerto Rico con relación a su retiro. También se estipuló que el Estado menoscabó sustancialmente ese contrato de retiro. Ante ese panorama, nuestro análisis se enfoca en determinar si el menoscabo sustancial es razonable y necesario conforme nuestra casuística. Trinidad Hernández et al. v. ELA et al., supra; Bayrón Toro v. Serra, supra. Luego de evaluar con detenimiento la prueba admitida, es insoslayable concluir que para propósitos de la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales, la Ley Núm. 160-2013 es irrazonable, y por consiguiente, inconstitucional en la medida que altera el derecho contractual que tienen los peticionarios deman- *872 dantes sobre su pensión de retiro, conforme a la Ley Núm. 91-2004.
Los peticionarios demandantes adujeron en sus alega-tos que al aprobar la Ley Núm. 160-2013 la Asamblea Le-gislativa no consideró el impacto que tendría el retiro ma-sivo de maestros sobre la solvencia del SRM. Asimismo, sostienen que ese retiro anticipado de miles de maestros agravaría la situación precaria del SRM. Para sostener esas conclusiones, los peticionarios demandantes presenta-ron varios informes de economistas y actuarios. Esa prueba pericial en unión a la propia evidencia que presentó el Estado demuestra que los peticionarios demandantes tienen razón. La Ley Núm. 160-2013 no adelanta la solven-cia actuarial del SRM.
En primer lugar, el Informe de los peritos economistas de la Asociación José I. Alameda Lozada y Alfredo Gonzá-lez Martínez alerta sobre la consecuencia imprevista de que se retiren de repente 7,000 maestros. Moción en torno a Prueba de la Parte Peticionaria Asociación de Maestros de Puerto Rico, Apéndice, pág. 1181, Caso Núm. CT-2014-0002, Pieza 4. La opinión de esos peritos es que ese retiro masivo “provocaría una erogación significativa en los fon-dos del [SRM] ante el aumento de la nómina de pensiones y la cancelación de las inversiones a corto plazo. La cance-lación de las inversiones a corto plazo reducirá las aporta-ciones que recibiría el Fondo con arreglo a su rendimiento”. íd.
En segundo lugar, la ODAE presentó como prueba peri-cial el informe del actuario José M. Pérez Díaz. En ese informe se analizan diversos escenarios sobre el impacto que puede tener el retiro masivo de miembros del SRM ante la aprobación de la Ley Núm. 160-2013. El actuario Pérez Díaz sostiene que ante el retiro repentino de 5,000 maestros, el SRM agotaría sus activos en el 2022. Opinión actuarial sobre la nueva Ley 160-2013 Sistema de Retiros de Maestros de Puerto Rico, por José M. Pérez Díaz, pág. *873 12, Caso Núm. CT-2014-0002, Pieza 1. Si el retiro súbito es de 10,000 miembros, el SRM terminaría sus activos en el 2018. Id. Por último, el actuario concluyó que de retirarse 15,000 maestros, los activos se agotarían tan pronto como en el 2016. íd. Compárese esas cifras con el informe de Milliman de 2012, que establece que de no reformarse el SRM los activos se agotarían en el 2020.
Por su parte, el Estado sostiene que “la Ley 160-2013 en efecto ataja el déficit estructural del Sistema y provee para que el Sistema se regenere en los próximos años”. (Enfasis omitido). Alegato de las recurridas, pág. 29, CT-2014-0002, 6ta parte. Para respaldar su conclusión, el Estado pre-sentó, en lo pertinente: (1) el Informe actuarial de Milli-man de 2012 y (2) la opinión de esa compañía de 27 de enero de 2014. Un análisis riguroso de esa prueba demues-tra que el Estado no pudo refutar la prueba presentada por los maestros. Lejos de ayudar a su causa, la prueba que presentó el Estado demuestra que es correcta la postura de los peticionarios-demandantes a los efectos de que la Ley Núm. 160-2013 es irrazonable para propósitos de la cláu-sula constitucional que prohíbe el menoscabo de obligacio-nes contractuales. Art. II, Sec. 7, Const. PR, supra.
Primero, notamos que el Informe de Milliman de 2012, pág. 40, Caso Núm. CT-2014-0002, Pieza 2, contiene una tabla que detalla los miembros activos que al 30 de junio de 2012 aportaban al SRM. Los datos de esa tabla son muy reveladores y demuestran que con la Ley Núm. 160-2013 es muy probable que ocurra un retiro masivo de maestros que liquide los activos del SRM antes de lo previsto.
Según la tabla antes citada, aproximadamente 7,089 participantes del SRM tenían derecho a retirarse conforme los términos de la Ley Núm. 91-2004, según enmendada. Ese número se divide entre los grupos siguientes:
(1) 88 personas que cuentan con 60 años de edad o más y 40 años de servicio o más;
*874 (2) 1,260 personas que cuentan con 60 años o más de edad y entre 10 a 24 años de servicio;
(3) 176 personas que cuentan con 55 años de edad o más y entre 35 a 39 años de servicio;
(4) 1,226 personas que cuentan con 50 años de edad o más y entre 30 a 34 años de servicio;
(5) 4,339 personas que cuentan con 50 de años o más de edad y entre 25 a 29 años de servicio.
Además, se desprende del Informe de Milliman de 2012 que existen 7,646 participantes del SRM que al 30 de junio de 2012 les faltaban entre uno a cinco años de servicio para obtener el derecho a retirarse conforme los términos de la Ley Núm. 91-2004. Recuérdese que conforme al Art. 40 de la Ley Núm. 91, 18 LPRA sec. 392e, todo participante del SRM que tuviera por lo menos 47 años de edad y 25 años de servicio o 60 años de edad y 10 años de servicio era elegible para retirarse. Los 7,646 se dividen entre los gru-pos siguientes:
(1) 8 personas entre 45 a 49 años de edad y entre 30 a 34 años de servicio;
(2) 447 personas entre 45 a 49 años de edad y entre 25 a 29 años de servicio;
(3) 3,671 personas entre 50 a 59 años de edad y entre 20 a 24 años de servicio;
(4) 3,520 personas entre 45 a 49 años de edad y entre 20 a 24 años de servicio.
Segundo, el informe de la compañía Milliman de 27 de enero de 2014 se limitó casi en su totalidad a describir las deficiencias actuariales que sufre el SRM de acuerdo al estudio actuarial de 2012. Si bien al final del informe se explica algunos cambios que realiza la Ley Núm. 160-2013 al SRM, en ningún lugar de ese documento se analiza la cantidad de maestros que se retiraría repentinamente, ni cómo eso afectaría la solvencia del SRM.
Más aún, hay que señalar que la “aportación adicional anual” que busca evitar que el valor de los activos brutos a partir del año 2018 sea menor a $300 millones y la “apor- *875 tación uniforme para la justicia magisterial” que crea una aportación anual de $30 millones para los años 2016-2017 y 2017-2018 y de $60 millones a partir del año fiscal 2018-2019 no están dirigidas a remediar el éxodo masivo de maestros al que aluden los demandantes peticionarios. Véase Art. 1.1 de la Ley Núm. 160-2013. Por el contrario, el Art. 7.1 de la Ley Núm. 160-2013 establece de forma cris-talina que el propósito de esas aportaciones es “solventar el déficit de flujo de caja del Sistema” que identificó el estudio de Milliman de 2012. En ningún lugar de la ley ni de ese informe se hace referencia al escenario real de que se reti-ren los miles de maestros que tienen ese derecho.
Además, surge de la prueba admitida que la Sra. Wanda G. Santiago López, directora ejecutiva interina del SRM, declaró que alrededor de 10,000 participantes activos han acudido a orientarse sobre los beneficios de retiro luego de aprobarse la Ley Núm. 160-2013. Declaración Jurada de la Sra. Wanda G. Santiago López, pág. 5, Caso Núm. CT-2014-0003, Pieza 1. Por su parte, el Ledo. Rafael Escalera Rodríguez, abogado del SRM, afirmó en la vista oral cele-brada el 26 de marzo de 2014 que, en la actualidad, alre-dedor de 7,340 miembros del SRM pueden retirarse. Gra-bación Vista Oral de 26 de marzo de 2014, 1:09:04. También expresó que ya se habían recibido aproximada-mente 4,100 solicitudes de retiro de personas que tienen derecho a ello. Id., 1:09:10. Asimismo, el representante legal del SRM indicó que 2,300 cualifican para la ventana de Retiro. Véase Art. 4.4(a) de la Ley Núm. 160-2013. Por úl-timo, sostuvo que se han recibido 1,300 solicitudes para esa ventana. íd., 1:09:20.
Entendemos que el retiro masivo de maestros al que aluden los peticionarios demandantes es previsible. Ad-viértase que el abogado del SRM concedió en la vista oral que ya se han recibido 4,100 solicitudes de retiro de perso-nas que tienen derecho a ello. Además, el Art. 4.4(a) de la Ley Núm. 160-2013 claramente crea una ventana de retiro *876 temprano para los participantes que, sin importar su edad, cumplan los 30 años de servicio entre el 1 de agosto de 2014 y el 30 de junio de 2016. Asimismo, el Art. 4.9 de la Ley Núm. 160-2013 elimina la aportación al plan de salud, el bono de medicamentos y el aguinaldo de navidad para quienes se jubilen a partir del 1 de agosto de 2014. De esa manera, solo los que se retiren con anterioridad a esa fecha son acreedores a esos beneficios adicionales. Eso incentiva que se jubilen anticipadamente aquellos participantes que cumplan con la edad y los años de servicio, para no perder la aportación patronal a un plan médico y otros beneficios.
Por otro lado, se desprende del trámite legislativo ace-lerado que con la prisa de legislar antes de la Noche Buena, la Asamblea Legislativa no hizo un estudio sobre la cantidad de maestros que se retirarían a causa de la Ley Núm. 160-2013, ni cómo eso afectaría la solvencia del SRM. Era de importancia vital que la Asamblea Legisla-tiva estudiara ese punto. Adviértase que con la Ley Núm. 160-2013 es natural que sobre 5,000 empleados activos que tienen la mayor remuneración, por tener más años de ser-vicio, se traspasen como pensionados a la nómina del SRM. Sobre el particular, el actuario Pérez Díaz afirmó que “la jubilación de miembros activos repentinamente aceleraría el colapso del sistema trayéndolo prácticamente hasta el tiempo presente”. Opinión actuarial por José M. Pérez Díaz, supra, pág. 12. Dicho de otro modo, con el éxodo de miles de maestros, se eliminan las aportaciones de esos miembros al SRM y se generan nuevas obligaciones sin que exista una fuente de ingreso para ellas.
También pesa en nuestro ánimo el Informe de Milliman de 2012, supra, pág. 5, que indica que el SRM para el año analizado (año fiscal 2011-2012) tuvo una pérdida profusa de $90,000,000 por los aproximadamente 1,400 miembros activos que se retiraron. ¿Cuánto será la pérdida si se reti-ran los aproximados 7,000 maestros que tienen ese derecho? Ello abona a la conclusión de que la Asamblea Legislativa *877 tenía el deber de sopesar este asunto cuidadosamente to-mando en consideración la jubilación anticipada de miles de maestros, cosa que no hizo.
Como se puede colegir, los demandantes en este caso presentaron evidencia que demuestra que las medidas adoptadas no garantizan la solvencia económica del SRM, requisito de umbral conforme con nuestra jurisprudencia. Trinidad Hernández et al. v. ELA et al., supra, pág. 839; Bayrón Toro v. Serra, supra, pág. 623. El Estado no presentó prueba que refutara esa conclusión. En consecuencia, dictaminamos que la Ley Núm. 160-2013 no adelanta el interés estatal importante requerido por nuestro ordenamiento constitucional en casos de reformas de sistemas de retiro: garantizar la solvencia del mismo sistema. íd. Los peticionarios demandantes demostraron que la Ley Núm. 160-2013 en vez de solventar el SRM, lo coloca en una posición más precaria. La prueba pericial de los peticionarios demandantes demostró que con la Ley Núm. 160-2013 se agotarán los activos en una fecha anterior o muy contemporánea al 2020, fecha proyectada por la situación difícil que enfrenta el SRM actualmente. Eso significa que la Ley Núm. 160-2013 es irrazonable y, por lo tanto, inconstitucional.
En atención a lo anterior, concluimos que la Ley Núm. 160-2013, y en particular sus Arts. 3.6, 3.9, 3.11, 4.3(a), 4.4, 4.6(a)(b)(c) y 5.1 a 5.5, son inconstitucionales en la medida que menoscaban sustancialmente el derecho contractual que tienen los maestros demandantes en cuanto a su plan de retiro, conforme a los términos de la Ley Núm. 91-2004.
Somos conscientes de que la política pública que impera en esta jurisdicción la establece la Asamblea Legislativa y no este Foro. AAR, Ex parte, 187 DPR 835 (2013); Lozada Sánchez et al. v. JCA, 184 DPR 898, 925-926 (2012); Delgado, Ex parte, 165 DPR 170, 192-193 (2005); Caquías v. Asoc. Res. Mansiones Río Piedras, 134 DPR 181, 189 *878 (1993). También tomamos en consideración la doctrina de autolimitación judicial que postula que cuando se cuestiona la validez de una ley, aun cuando se susciten dudas serias sobre su constitucionalidad, el Poder Judicial primero decidirá si hay una interpretación razonable que permita soslayar la cuestión constitucional. Brau, Linares v. ELA et als., 190 DPR 315 (2014); E.L.A. v. Aguayo, 80 DPR 552, 596 (1958). Sin embargo, esa deferencia termina cuando se evidencia que el Estado quebrantó la Constitu-ción al aprobar una ley. Esa es la situación que nos ocupa. La deferencia a la política pública legislada no significa la abdicación de nuestro deber constitucional de defender los derechos civiles de quienes reclaman válidamente la reparación judicial de un agravio.
Ante la realidad ineludible de que el Estado menoscabó severamente los derechos contractuales de miles de maestros sin ni siquiera asegurarse de que alcanzaría el interés de adelantar la solvencia del SRM, es nuestro deber cons-titucional garantizar a los maestros afectados el derecho que tienen a que el Estado no le menoscabe sustancial-mente sus derechos contractuales sin cumplir con el están-dar aplicable.
Al concluir que la Ley Núm. 160-2013 es irrazonable para propósitos del Art. II, Sec. 7, de la Constitución de Puerto Rico, supra, resulta innecesario entrar a discutir si constituyen alternativas menos onerosas las medidas adi-cionales que contiene el Informe del Comité de Diálogo, que fue suscrito por altos funcionarios de la Rama Ejecu-tiva (el secretario de estado, Hon. David Bernier Rivera y el secretario del trabajo, Hon. Vance Thomas Rider). En vista del resultado al que arribamos, tampoco es necesario discutir los restantes argumentos constitucionales que plantearon los peticionarios demandantes en sus alegatos.
*879 V
Conviene, entonces, enfatizar el alcance de nuestros pronunciamientos. La Ley Núm. 160-2013 elimina la aportación al plan de salud (hasta $100 al mes), el bono para medicamentos ($100 al año) y el aguinaldo de Navidad ($600 al año) para quienes se jubilen a partir del 1 de agosto de 2014. Asimismo, elimina el bono de verano ($100) para todos los participantes. Además, reduce el aguinaldo de Navidad de $600 a $200 a quienes se hayan jubilado antes del 1 de agosto de 2014. En Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 839 esc. 2, dijimos que “los beneficios otorgados mediante las leyes especiales que la Reforma del Sistema de Retiro elimina no forman parte de su pensión”. Véase, además, Domínguez Castro et al. v. E.L.A. I, supra, págs. 67-70. Por el contrario, concluimos que eran gracias legislativas que no crean un interés propietario. Además, al comparar el Art. 1-101 de la Ley Núm. 447 de 15 de mayo de 1951, según enmendado, conocida como la Ley de Retiro del Gobierno de Puerto Rico y sus Instrumentalidades, 3 LPRA see. 761, con el Art. 3 de la Ley Núm. 91-2004, 18 LPRA sec. 391a, notamos que la legislación habilitadora del SRM es diáfana en establecer que esos beneficios adicionales no forman parte de la pensión. En su consecuencia, en el caso que nos atañe concluimos que es constitucional la See. 2 de la Ley Núm. 160-2013 que derogó las leyes especiales que concedían esas gracias legislativas que no forman parte de la pensión y el Art. 4.9 de esa misma ley que eliminó ciertos beneficios adicionales a los que se retiren a partir del 1 de agosto de 2014.
Además, es importante señalar que los participantes que entraron a cotizar al SRM con posterioridad a la aprobación de la Ley Núm. 160-2013, tienen derecho solamente a la pensión que establece ese estatuto. Esa fue la obligación contractual que el Estado asumió con ese *880 grupo de trabajadores. Ese grupo no sufrió un menoscabo de su derecho contractual que active el Art. II, Sec. 7 de la Constitución de Puerto Rico, supra.
VI
Por los fundamentos antes expuestos, concluimos que la Ley Núm. 160-2013, y en particular sus Arts. 3.6, 3.9, 3.11, 4.3(a), 4.4, 4.6(a)(b)(c) y 5.1 a 5.5, son inconstitucionales en la medida que menoscaban sustancialmente y de forma irrazonable el derecho contractual que tienen los peticiona-rios demandantes en cuanto a su plan de retiro, conforme los términos de la Ley Núm. 91-2004.
Antes de menoscabar sustancialmente las obligaciones contractuales que asumió, el Estado debe asegurarse de que la ley aprobada a esos fines adelanta el interés estatal importante requerido por nuestro ordenamiento constitu-cional en casos como este: garantizar la solvencia del sis-tema de retiro.
Por otra parte, concluimos que es constitucional la See. 2 de la Ley Núm. 160-2013 que derogó las leyes especiales que concedían esas gracias legislativas que no forman parte de la pensión y el Art. 4.9 de esa misma ley que eliminó ciertos beneficios adicionales a los que se retiren a partir del 1 de agosto de 2014.
Por último, resolvemos que los participantes que entra-ron a cotizar al SRM con posterioridad a la aprobación de la Ley Núm. 160-2013, tienen derecho solamente a la pen-sión que establece ese estatuto. Esa fue la obligación contractual que el Estado asumió con ese grupo de trabaja-dores.

Se dictará sentencia de conformidad.

La Jueza Asociada Señora Pabón Charneco emitió una opinión de conformidad, a la que se unió el Juez Asociado Señor Estrella Martínez. El Juez Asociado Señor Rivera García emitió una opinión de conformidad. El Juez Aso- *881 ciado Señor Estrella Martínez emitió una opinión de conformidad. La Jueza Asociada Señora Fiol Matta emitió una opinión disidente, a la que se unió el Juez Presidente Señor Hernández Denton. La Juez Asociada Señora Rodrí-guez Rodríguez emitió una opinión disidente, a la que se unió el Juez Presidente Señor Hernández Denton. El Juez Asociado Señor Kolthoff Caraballo emitió un voto de conformidad. El Juez Asociado Señor Feliberti Cintrón se inhibió.

 En particular, formaron parte de ese Comité: el Arzobispo Católico de San Juan, Mon. Roberto González Nieves, el Secretario del Trabajo, Hon. Vance Thomas Rider, la Alcaldesa de San Juan, Hon. Carmen “Yulín” Cruz Soto, el Secretario de Estado, Hon. David Bernier Rivera, la Prof.a Aida Luz Díaz Rivera, el Ledo. Alejandro Torres Rivera, el Prof. Jorge Soto Díaz, el Alcalde de Toa Baja, Hon. Aníbal Vega Borges, el Rvdo. Angel Luis Rivera Agosto, la Prof.a Justina Ocasio Landrón, el Prof. Emilio Nieves Torres, la Prof.a María Elena Lara Fontánez, el Prof. Domingo Madera Ruiz y la Prof.a Eva Ayala Reyes.

 Por el contrario, en la jurisdicción federal se presume que no existe una obligación contractual del Estado en cuanto a los planes de pensiones. National R.R. Passenger Corp. v. Atchison Topeka & Santa Fe, 470 US 451, 466 (1985); J.M. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 49-50 (2013).